FILED
United States Court of Appeals
Tenth Circuit

February 11, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LAURA CONROY,

          Plaintiff-Appellant,

v.

THOMAS VILSACK, Secretary of
Agriculture, United States Department of
Agriculture,

          Defendant-Appellee.

No. 11-4091

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:06-CV-00867-CW)**

April Hollingsworth of Hollingsworth Law Office, LLC (Erik Strindberg of Strindberg &
Scholnick, LLC, with her on the briefs), Salt Lake City, Utah, for Plaintiff-Appellant.

Benjamin M. Shultz, United States Department of Justice, Civil Division, Washington,
D.C. (Tony West, Assistant Attorney General, Washington D.C.; David B. Barlow,
United States Attorney, Salt Lake City, Utah; Marleigh D. Dover, United States
Department of Justice, Civil Division, Washington, D.C., with him on the brief), for
Defendant-Appellee.

Before **TYMKOVICH**, **EBEL**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

      Laura Conroy filed this Title VII lawsuit against her employer, the United States

Forest Service, after it (among other things) filled an open position with a male employee, instead of her. The district court excluded the testimony of Ms. Conroy's two experts and granted summary judgment to the Forest Service. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I

The Forest Service, an agency within the Department of Agriculture, manages the national forests. It is divided into nine geographical regions, and since 1991, Ms. Conroy has been employed with Region 4 (also known as the Intermountain Region) in Ogden, Utah. She began as a GS-9 "Computer Programmer Analyst" and, by 1995, had progressed to a GS-12 "Computer Specialist." As part of her job description, she served as a programming and technical expert for certain database systems and as the regional coordinator for a Forest Service database known as "INFRA."

INFRA was originally designed in the mid-1990s to help keep track of Forest Service infrastructure like roads, bridges, buildings, and dams. It was later expanded to include other forms of data, including financial data. Agency personnel use INFRA to establish land management policies and to make fiscal, contracting, and permitting decisions.

In spring 2001, Region 4 management advertised an opening for a new position called "INFRA Program Manager." At the time, two other regions had filled a similar position. One region had filled the job in the "administrative" series, which did not require a college degree, while the other region had filled it in the "professional" series,

which required either a college degree or equivalent professional experience. Region 4 advertised the position in both series—a so-called "interchangeable" listing. The advertisement noted, among other things, that "[c]omprehensive knowledge and skills in ORACLE, SQL, and PC spreadsheet and database software" were required. Aplt. App. at 850 (INFRA Program Manager Job Description, filed Feb. 9, 2009).

Ms. Conroy did not have a college degree. She applied for the INFRA Program Manager position in the administrative series. She was found to be qualified, and her name, along with that of one other qualified applicant, was passed on to Larry Larson, the head of the group where the new position would be located. Mr. Larson, however, decided to readvertise the position. He would later explain that his reason for doing so was to broaden the pool of applicants.

A revised announcement was issued in fall 2001. Among other things, it modified the job requirement noted above, replacing the words "[c]omprehensive knowledge and skills in" with simply "[k]nowledge of." *Id.* at 846 (Position Description Correction Notice, filed Feb. 9, 2009). The new advertisement drew interest from a greater number of applicants, and four were certified as sufficiently qualified for the position. Ms. Conroy was certified under the administrative announcement, and three others were certified under the professional announcement. Among the latter three candidates was Daniel Hager, who had not applied when the position was originally advertised in the spring.

The candidates' applications were submitted to a peer advisory panel consisting of

five individuals: (1) Jack McDonald, who had drafted the vacancy announcement; (2) Terry Padilla, (3) Mary Jean Brackmann, and (4) Cary Williams, each of whom was from a different department of the Forest Service; and (5) Tamara Hanan, who served as management's representative on the panel. The panel's task was to evaluate the candidates using criteria known as "Knowledge, Skills, and Abilities," or "KSAs," and then to make recommendations to a selecting official, who would make the ultimate hiring decision.[1]

---

[1] The five KSAs used by the panel for evaluating candidates in the professional series were as follows:

> 1. "Professional knowledge and experience" in a wide range of sciences, "applicable to [a] broad range of business and resource practices," in order to understand, evaluate, and make recommendations on various agency projects.
>
> 2. "Professional knowledge of natural resources and their management sufficient to be conversant with other specialist[s] in related fields . . . ."
>
> 3. "Knowledge and demonstrated experience in distributed database systems in order to provide guidance and management direction to Forests and other Resource program areas in database management and operation."
>
> 4. "Ability to provide leadership and guidance as the Regional INFRA Program Manager in the resolution of problems in planning, organizing, and coordinating the implementation of the INFRA corporate database."
>
> 5. "Skill in written and oral communications sufficient to conduct workshops, training sessions, [and] management briefings," among other things.

Aplt. App. at 669 (Fall 2001 Vacancy Announcement, filed July 30, 2008). For the purpose of evaluating candidates in the administrative series, the term "Professional knowledge" in the first two KSAs was replaced with the term "Working knowledge." *See id.* at 663.

-4-

After evaluating the four candidates, the panel recommended Mr. Hager for the position. The selecting official, Chris Pyron, followed the recommendation and hired Mr. Hager. Shortly thereafter, in March 2002, Ms. Conroy filed a formal grievance with the agency, alleging age and sex discrimination.

In 2003, Mr. Hager left the INFRA Program Manager position, and the position was readvertised in February 2004. An intervening change in Forest Service policy prohibited interchangeable listings, so the position was advertised solely in the professional series. *See id.* at 676 (Memo, dated June 20, 2002) ("Effective immediately no new positions may be announced as interchangeable positions."). Although Ms. Conroy applied again, she was deemed not qualified, and management ultimately selected Andrea Gehrke. Ms. Conroy filed a second formal grievance, alleging that the decision to advertise the position solely in the professional series was made in order to retaliate against her for filing the first grievance in 2002.

After exhausting administrative remedies, Ms. Conroy filed suit in federal district court pursuant to Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17. She asserted various individual and class claims arising out of the agency's 2001 and 2004 hiring decisions. The district court dismissed the class claims, and discovery commenced on the individual sex discrimination and retaliation claims. The Forest Service later moved for summary judgment.

The district court granted the Forest Service's motion in March 2011. As a threshold matter, the court excluded the testimony of Ms. Conroy's two experts, Dr.

Nancy Dodd and Paul Katz. The court found that Dr. Dodd was not qualified to testify on "sex stereotyping" because it was beyond the reasonable confines of her expertise, and that Mr. Katz was uninformed and had failed to adequately explain his conclusions regarding the propriety of the agency's 2004 vacancy announcement.

Turning to the merits, the district court construed Ms. Conroy's complaint as raising four claims: (1) a sex discrimination claim arising out of her non-selection in fall 2001; (2) a sex discrimination claim premised on the agency's decision to readvertise the position in spring 2001; (3) a sex discrimination claim pertaining to the agency's 2004 decision not to list the position in the administrative series; and (4) a retaliation claim pertaining to that same 2004 decision. As to her first claim, the court found that Ms. Conroy failed to show that the agency's nondiscriminatory reasons for hiring Mr. Hager were pretextual. The court addressed and rejected the second claim in a footnote, holding that the agency was not required to justify every intermediate step in its hiring process. In a brief paragraph, the court rejected Ms. Conroy's third sex discrimination claim, finding that she failed to show pretext. As to her fourth claim for retaliation, the court concluded that she failed to prove causation and, in the alternative, pretext.

Ms. Conroy timely appealed.

## II

As a threshold matter, we must address Ms. Conroy's contention that the district court erred in excluding the testimony of her experts, Dr. Dodd and Mr. Katz. Federal Rule of Evidence 702 assigns to district courts a gatekeeping function with respect to the

admissibility of expert opinions. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). Whether the district court "actually performed its gatekeeper role" and whether it applied the correct legal standard in doing so are questions we review de novo. *Frederick v. Swift Transp. Co.*, 616 F.3d 1074, 1082 (10th Cir. 2010). "[T]he *manner* in which the district court performs this gatekeeping role" is reviewed for an abuse of discretion. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (emphasis added). The proponent of expert testimony bears the burden of showing that the testimony is admissible. *Id.*

A two-part test applies to determine admissibility. First, the district court must determine "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Id.* (quoting Fed. R. Evid. 702). Second, the court "must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006); *see also 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (applying "a two-step analysis"); *Ralston*, 275 F.3d at 969 (noting that "the district court had to undergo a two-step analysis" in determining the admissibility of an expert's opinion); *cf. N. Am. Specialty Ins. v. Britt Paulk Ins. Agency, Inc.*, 579 F.3d 1106, 1112 (10th Cir. 2009) (focusing on the admissibility test's second part and recognizing this part itself has two distinct components—reliability, *and* relevancy, that is, the evidence "must be helpful to

the jury").

We hold that the district court did not abuse its discretion in excluding the expert testimony of Dr. Dodd and Mr. Katz.

**A**

The district court excluded the testimony of Dr. Dodd at the first step of the two-part test, finding her to be unqualified. Dr. Dodd holds a Ph.D. in business and had worked in the areas of human-resource management and organizational behavior for twenty-five years. She also had previously testified as an expert in cases involving age discrimination, sexual harassment, and wrongful termination. In this case, Dr. Dodd would have testified regarding sex stereotyping in the workplace, explaining how it manifested itself in Region 4's selection of Mr. Hager over Ms. Conroy.

The district court found, however, that Dr. Dodd had never researched or written about sex stereotyping; that she became familiar with the topic only after being retained for this case; and that she could not recall articles or relevant cases supporting the application of sex-stereotyping research to disparate-treatment claims.[2] Due to this lack of specialization, the court correctly looked to whether sex stereotyping was "within the reasonable confines" of Dr. Dodd's expertise. *Ralston*, 275 F.3d at 970 (quoting *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1520 (10th Cir. 1996)) (internal quotation

---

[2] These points were arguments that the Forest Service advanced before the district court, and because Ms. Conroy did not contest or seek to rebut them, the district court "consider[ed] them conceded." Aplt. App. at 293 (Mem. Decision & Order, filed Mar. 7, 2011).

marks omitted). Ms. Conroy failed to articulate any meaningful argument in support of that proposition, only asserting in conclusory fashion that sex stereotyping was "clearly" within the reasonable confines of Dr. Dodd's experience and expertise. Aplt. App. at 294. The district court would not "connect the proverbial dots" for Ms. Conroy and found that she had failed to carry her burden to show that Dr. Dodd was qualified to opine on sex stereotyping. *Id.*

The district court did not abuse its discretion in excluding Dr. Dodd's testimony. To qualify as an expert, Dr. Dodd had to possess skill, experience, or knowledge in the "particular field" of sex stereotyping, *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (quoting *Graham v. Wyeth Labs.*, 906 F.2d 1399, 1408 (10th Cir. 1990)) (internal quotation marks omitted), or sex stereotyping had to fall "within the reasonable confines" of her expertise, *Ralston*, 275 F.3d at 970 (quoting *Compton*, 82 F.3d at 1520) (internal quotation marks omitted). Neither showing was made.

Dr. Dodd concededly had no particular expertise in sex stereotyping. Her general expertise was in business and human-resource management, and her more specific expertise was in age discrimination, sexual harassment, and wrongful termination. Though it is certainly possible that sex stereotyping is sufficiently related to these areas so as to be within their "reasonable confines," it was up to Ms. Conroy to establish that connection, and she failed to do so. Further, in light of the fact that Dr. Dodd had never researched, written about, or opined on this topic before, it was hardly "arbitrary, capricious, whimsical, or manifestly unreasonable" for the district court to find her

unqualified. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1163–64 (10th Cir. 2000) (quoting *Copier v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir. 1998)) (internal quotation marks omitted); *see Milne v. USA Cycling, Inc.*, 575 F.3d 1120, 1133–34 (10th Cir. 2009) (holding that it was not an abuse of discretion to exclude expert testimony on standard of care in mountain-bike races because the purported expert, though experienced in "organizing and supervising paved road bike races," had minimal mountain-biking experience and "had never published any articles about bicycle racing of any sort, let alone mountain bike racing"); *Ralston*, 275 F.3d at 969–70 (discerning no abuse of discretion in the court's decision to exclude an orthopaedic surgeon's testimony concerning adequacy of warning on orthopaedic device, despite surgeon's familiarity with "general orthopaedic and surgical principles and concepts," because surgeon had no particular experience with the device at issue or with medical warnings and had not published in the area).

**B**

The district court excluded the testimony of Mr. Katz at the second step of the two-step analysis, finding his opinion to be unreliable. Mr. Katz is a personnel consultant and has extensive experience in human-resource management. His experience includes a thirteen-year stint as Assistant Director of the U.S. Office of Personnel Management, where he was responsible for position classification and qualification standards for some two million federal civilian employees. In this case, Mr. Katz would have testified that the Forest Service's 2004 vacancy announcement for the INFRA Program Manager

position improperly required applicants to have a college degree. In his opinion, this requirement was "purposefully designed to deny Ms. Conroy the position." Aplt. App. at 977 (Katz Expert Report, filed Feb. 9, 2009).

The district court, however, excluded Mr. Katz's testimony. It found that his report "demonstrate[d] a lack of knowledge" regarding the agency's 2004 decision to advertise the position solely in the professional series, and that Mr. Katz "fail[ed] to provide a meaningful analysis of how he came to conclude what he did while showing that his testimony reliably applied the facts of this case." *Id.* at 295.

The district court did not abuse its discretion. The proponent of expert testimony is required to show, among other things, that the expert's opinion is "*based on facts which satisfy Rule 702's reliability requirements.*" *Nacchio*, 555 F.3d at 1241 (emphasis added) (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)) (internal quotation marks omitted); *see id.* ("Reliability questions may concern the expert's data, method, or his application of the method to the data."). In that regard, Mr. Katz's report came up woefully short. Mr. Katz mistakenly believed that the 2001 vacancy announcement had been advertised solely in the administrative series, and he erroneously thought that the position had never been filled in 2001. *See* Aplt. App. at 976–77. More specifically, he was unaware that the position had been advertised in both the professional and administrative series, and that it had ultimately been filled in the professional series. Also, Mr. Katz's report contained no discussion of the intervening change in Forest Service policy that prohibited interchangeable listings, suggesting that he was unaware of

-11-

this fact, too. Finally, we note that Mr. Katz's understanding that the position "require[d] a baccalaureate degree," *id.* at 977, was not entirely accurate. The position required *either* a college degree or equivalent professional experience. In sum, oblivious to these key facts, Mr. Katz's opinion on the propriety of the 2004 listing could not possibly have "rest[ed] on a reliable foundation." *Nacchio*, 555 F.3d at 1246 (quoting *Mascenti v. Becker*, 237 F.3d 1223, 1231 (10th Cir. 2001)) (internal quotation marks omitted). The district court was right to exclude his testimony.

### III

We turn now to Ms. Conroy's challenge to the district court's entry of summary judgment in favor of the Forest Service. "We review a district court's grant of summary judgment de novo, applying the same standard as the district court." *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011). "[S]ummary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Morris v. City of Colo. Springs*, 666 F.3d 654, 660 (10th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted). In reviewing a grant of summary judgment, "we consider the evidence in the light most favorable to the non-moving party." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011) (quoting *Duvall v. Ga.-Pac. Consumer Prods., L.P.*, 607 F.3d 1255, 1259 (10th Cir. 2010)) (internal quotation marks omitted).

In this appeal, Ms. Conroy focuses on three Title VII claims: two for sex discrimination pertaining to the 2001 application process and one for retaliation

pertaining to the 2004 application process. Although the district court construed Ms. Conroy's complaint as raising a fourth claim of sex discrimination pertaining to the 2004 application process, Ms. Conroy has not briefed any arguments pertaining to that claim, so we consider it abandoned. *See Tran v. Trustees of State Colleges in Colo.*, 355 F.3d 1263, 1266 (10th Cir. 2004) ("Issues not raised in the opening brief are deemed abandoned or waived." (quoting *Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997)) (internal quotation marks omitted)).

A plaintiff may prove a violation of Title VII either by direct evidence of discrimination or retaliation, or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). Indisputably, Ms. Conroy does not rely on direct evidence of discrimination or retaliation, so *McDonnell Douglas* applies. *See Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011).

> Under that rubric, the plaintiff must first establish a prima facie case of discrimination or retaliation. Then, the defendant may come forward with a legitimate, non-discriminatory or non-retaliatory rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual. This framework applies to both discrimination and retaliation claims.

*Id.* (citations omitted). We address Ms. Conroy's first two claims for discrimination in this Part. We address her third claim for retaliation in Part IV, *infra*.

Ms. Conroy contends that the district court erred in granting summary judgment to the Forest Service on her 2001 discrimination claims. She primarily contends that she

suffered sex discrimination when Mr. Hager, a male, was ultimately selected for the INFRA Program Manager position, even though she was the more qualified candidate. She also articulates a second discrimination claim, asserting that the agency's decision in spring 2001 to relax the qualification standards and readvertise the job—after she had already applied for it and been found qualified—constituted a separate act of sex discrimination.

As noted, to succeed on her discrimination claims, Ms. Conroy must first establish a prima facie case. *See, e.g.*, *Barlow v. C.R. England, Inc.*, 703 F.3d 497, at 505 (10th Cir. 2012) ("If the plaintiff does not establish a prima facie case, his entire case fails."). As we recently stated in *Barlow*, "'The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination.' . . . [T]he plaintiff's articulation of his prima facie case may vary depending on the nature of the claim." *Id.* (quoting *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005)). We need not determine the precise formulation of the elements of Ms. Conroy's prima facie case for her two discrimination claims. The government does not contest that Ms. Conroy has satisfied her prima facie case for the claims; accordingly, we have no occasion to pursue the matter further and instead focus on the other elements of the *McDonnell Douglas* framework.

**A**

We begin with Ms. Conroy's primary discrimination claim regarding the 2001

-14-

selection of Mr. Hager. As noted, the Forest Service does not dispute that Ms. Conroy has made out her prima facie case, so the burden shifts to the agency to articulate a legitimate, nondiscriminatory reason for its selection of Mr. Hager instead of Ms. Conroy. Before the district court, the Forest Service offered such a reason. It argued that, although Ms. Conroy had significant technical expertise as Region 4's INFRA Coordinator, technical skills were less critical to the INFRA Program Manager position than others, and "most of the technical work was being handled by the Washington Office." Aplt. App. at 74 (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J., filed July 30, 2008). According to the agency, the most important qualifications were "leadership and program management, as well as the knowledge and experience necessary to be able to coordinate and communicate successfully with officials from the many different disciplines of the Forest Service." *Id.* In these key areas, the agency argued, Mr. Hager had the edge over Ms. Conroy. *See id.* at 76 ("Mr. Hager's strong program management experience at all levels of the Forest Service made him a superior candidate overall.").

The district court found this explanation to be both legitimate and nondiscriminatory, and Ms. Conroy does not challenge that conclusion on appeal. Instead, her arguments focus exclusively on pretext, the third piece of the *McDonnell Douglas* framework. Accordingly, we turn our attention there.

"[P]retext can be shown in a variety of ways," and "there is no one specific mode of evidence required to establish the discriminatory inference." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008). Generally, "a plaintiff can establish pretext by

showing the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief." *C.R. England*, 644 F.3d at 1038–39 (alteration in original) (quoting *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010)) (internal quotation marks omitted).

Ms. Conroy marshals four different forms of evidence in an effort to demonstrate a triable dispute over pretext. She asserts (1) that she was overwhelmingly more qualified than Mr. Hager, (2) that the agency's explanation for choosing Mr. Hager was inconsistent and contradictory, (3) that the selection process exhibited procedural irregularities, and (4) that the agency relied on subjective factors in the selection process. We address each of these arguments in turn. As we explain below, we conclude that Ms. Conroy has not demonstrated pretext for intentional discrimination. In particular, we see nothing in the decisionmaking process that would allow a reasonable jury to conclude that the process was used to discriminate against her on the basis of sex.

**1**

Ms. Conroy first contends that she was more qualified than Mr. Hager such that the Forest Service's failure to select her evinces pretext. It is true that "[w]e will draw an inference of pretext where 'the facts assure us that the plaintiff is better qualified than the other candidates for the position.'" *Santana v. City & Cnty. of Denver*, 488 F.3d 860, 865 (10th Cir. 2007) (quoting *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2003)). However, we will not draw that inference based upon "minor differences between

plaintiff's qualifications and those of successful applicants"; rather, there must be "an overwhelming merit disparity." *Id.* (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1319 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)) (internal quotation marks omitted). Ms. Conroy has failed to make that showing.

At the outset, in assessing the sufficiency of Ms. Conroy's arguments, it is helpful to underscore the salient considerations underlying the agency's hiring decision. Specifically, the Forest Service considered leadership and program management experience to be the most important qualifications for the position. *See* Aplt. App. at 506 (Dep. of Mr. Pyron, Apr. 10, 2008). Ms. Conroy has made no argument that she was overwhelmingly more qualified than Mr. Hager in this regard, nor does the record support that proposition. While Ms. Conroy had worked as Region 4's INFRA Program Coordinator, Mr. Hager also had leadership and project management experience of his own. At the time that he applied for the vacancy, Mr. Hager was managing Region 4's INFRA Travel Routes and Deferred Maintenance program and was the regional representative to the INFRA Travel Routes User Board. He had served on selection panels to fill regional and forest-level staff positions and had chaired an interdisciplinary team of Forest Service personnel. His application also highlighted his prior management experience in budgeting, data collection, and engineering projects. We need not decide whether Ms. Conroy was as qualified, or less so, than Mr. Hager with respect to leadership and management experience. It suffices for us to say that Ms. Conroy has

failed to demonstrate "an overwhelming merit disparity" between her and Mr. Hager in this very key area. *Santana*, 488 F.3d at 865 (quoting *Bullington*, 186 F.3d at 1319) (internal quotation marks omitted).

Turning to Ms. Conroy's specific arguments, Ms. Conroy focuses on two points: technical skills and communication skills. Regarding the first, she asserts that Mr. Hager lacked even the minimum qualifications required by the position. She further argues that her own technical skills were vastly superior to Mr. Hager's. Regarding communication skills, she contends that Mr. Hager was lacking in this area, too.

We reject the contention that Mr. Hager lacked the minimum technical qualifications for the position. Ms. Conroy apparently conceded in the district court that Mr. Hager was qualified. *See* Aplt. App. at 125 (Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J., filed Feb. 9, 2009) ("Hager did not qualify for the position *until* after the technical requirements pertaining to the management of the INFRA database were negated . . . . [T]he Agency's conduct in changing the requirements of the INFRA Program Manager position *so that Hager could qualify* is significant evidence of pretext." (emphases added)). Arguably, then, Ms. Conroy's contention is waived.

In any event, the record does not support her position. The fall 2001 advertisement required, among other things, "knowledge of ORACLE, SQL, and PC and spreadsheet database software." Aplt. App. at 846. Mr. Hager's application highlighted his skills and experience with these software systems, or with applications that depended upon them (including INFRA, an ORACLE- and SQL-based system). *See id.* at 684 (Hager Appl.

-18-

Package, filed July 30, 2008). Moreover, a Forest Service human-resources specialist certified Mr. Hager as qualified for the position, *see id.* at 760 (Certification of Candidates, dated Nov. 9, 2001)—a certification that the selecting official, Mr. Pyron, was entitled to rely upon, *see C.R. England*, 644 F.3d at 1044 ("[W]e examine the facts as they appear *to the person making the decision . . . .*" (quoting *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (en banc) (internal quotation marks omitted)).[3]

This leaves Ms. Conroy's argument that her technical skills were vastly superior to Mr. Hager's. The Forest Service has conceded that Ms. Conroy was *more* qualified than Mr. Hager in this regard. Whether there was "an overwhelming merit disparity" between the two candidates is unclear. *Santana*, 488 F.3d at 865 (quoting *Bullington*, 186 F.3d at 1319) (internal quotation marks omitted). Fortunately, we need not resolve the issue. Even granting Ms. Conroy's contention, she still fails to demonstrate that she was overwhelmingly more qualified than Mr. Hager *on the whole*, taking into account all of the factors that the agency found relevant.

In this regard, we reject Ms. Conroy's argument that she was overwhelmingly more qualified than Mr. Hager in the area of communication skills. Ms. Conroy

---

[3]    In this case, Ms. Conroy does not articulate a cat's paw theory of liability. For example, she does not contend that the human-resources specialist certified Mr. Hager as qualified out of a desire to discriminate against Ms. Conroy on the basis of sex. *Cf. Crowe*, 649 F.3d at 1194 ("[W]here an employee performs an act motivated by discriminatory animus intending to cause an adverse employment decision, the employer will be liable if that act is a proximate cause of the eventual adverse employment decision.").

highlights her "experience in conducting workshops, training sessions and management briefings."  Aplt. Opening Br. at 35 (quoting Aplt. App. at 436 (Conroy Appl. for Fed. Employment, Dec. 3, 2001)) (internal quotation marks omitted).  But Mr. Hager's application noted similar experiences.  *See* Aplt. App. at 685 (highlighting experience with giving presentations, conducting training sessions, participating in question-and-answer sessions at public meetings, and interacting with numerous professionals from different backgrounds).

Thus, we conclude that Ms. Conroy's arguments concerning alleged merit disparities fail to raise a "genuine doubt about [the Forest Service's] motivation" in selecting Mr. Hager.  *Santana*, 488 F.3d at 866 (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1200 (10th Cir. 2000)) (internal quotation marks omitted).

**2**

Ms. Conroy next argues that inconsistencies and contradictions in the agency's proffered explanations for choosing Mr. Hager support a determination of pretext.  As we have recognized, a plaintiff can show pretext by demonstrating that the employer's explanation for its decision "was so implausible, incoherent, or internally contradictory" that the decision must have been made on some other basis.  *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004).  The focus is on the employer's *justification* for its decision—for example, did the employer offer inconsistent reasons for its decision, or is the employer's explanation so implausible that a jury could find it unworthy of

-20-

credence?  *See Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1309–10 (10th Cir. 2005).  In assaying the employer's explanation, "we examine the facts as they appear *to the person making the decision*."  *C.R. England*, 644 F.3d at 1044 (quoting *Zamora*, 478 F.3d at 1166) (internal quotation marks omitted).  We conclude that Ms. Conroy has failed to demonstrate that Mr. Pyron's reasons for selecting Mr. Hager were pretextual.

Mr. Pyron testified that he was looking for a candidate with strong management capabilities and that the "technical aspects" of the job were less important.  Aplt. App. at 506.  He stated that the selection panel recommended Mr. Hager for the position and that its endorsement of Mr. Hager was "strong."  *Id.* at 507.  Before making his decision, Mr. Pyron contacted Ms. Conroy's supervisor, Elizabeth Close, who concurred in the panel's recommendation and agreed that Mr. Hager was the better candidate.  Based on all this information, Mr. Pyron selected Mr. Hager.  *See id.*

Ms. Conroy attempts to impugn the justification for Mr. Pyron's decision by arguing that the panel did not unanimously recommend Mr. Hager.  We question whether panel unanimity was even required; Ms. Conroy does not argue that agency procedures required unanimity.  At bottom, what matters is whether Mr. Pyron's explanation—that Mr. Hager "was a strong recommendation from the panel," *id.*—is unworthy of belief.  Ms. Conroy points to nothing to undermine that explanation.  Indeed, in their testimony, all panel members agreed that Mr. Hager was the preferred candidate.  *See id.* at 363 (Dep. of Mr. Padilla, Mar. 4, 2008) (noting that Mr. Hager "was probably number one because he had a broader breadth of experience"); *id*. at 537 (Dep. of Ms. Hanan, Apr. 23,

-21-

2008) (noting that the panel was "unanimous in their evaluation and ranking that Mr. Hager was the number one candidate"); *id.* at 570 (Dep. of Mr. McDonald, Apr. 3, 2008) (noting that "the panel" considered Mr. Hager the top candidate); *id.* at 592 (Dep. of Ms. Brackmann, Apr. 3, 2008) (noting that "our panel" ranked Mr. Hager higher than Ms. Conroy); *id.* at 717 (Aff. of Cary Williams, dated Aug. 22, 2002) (noting that "overall" the panel "felt that Mr. Hager was the top choice").

Ms. Conroy also points to discrepancies in the panel members' use of the KSAs to evaluate the candidates. According to their testimony, two panel members recalled that the KSAs pertaining to leadership were given more weight; one panel member recalled that all five KSAs were equally weighted; and one panel member could not recall any specific weighting. We think these discrepancies are minor and are insufficient to demonstrate pretext.

In the first place, we are inclined to discount the persuasiveness of such evidence. Notably, the panel members were not the ultimate decisionmakers. *See Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397, 1402 (10th Cir. 1988) (holding that subordinates' use of inconsistent criteria did not show that the ultimate decisionmaker's decision was pretextual).

Second, nothing about the panel's evaluation process suggests that Mr. Pyron's reasons for selecting Mr. Hager were pretextual. Most of the KSAs emphasized the need for leadership and management capabilities. *See supra* note 1. So did the job title itself: "INFRA Program Manager." And all panel members agreed that technical skills—Ms.

-22-

Conroy's strong suit—were not the paramount consideration in evaluating the candidates. *See* Aplt. App. at 362 (noting the need to look at "breadth of experience" across the KSAs); *id.* at 551 (Aff. of Ms. Hanan, dated Sep. 6, 2002) ("[T]he technical aspects of the job were less important."); *id.* at 580–81 (Aff. of Mr. McDonald, dated Sep. 7, 2002) (highlighting Ms. Conroy's technical skills but noting that the job "reflected a need for more managerial skills than what she had been doing"); *id.* at 593 ("We were not so much interested in [the third KSA] because we didn't want a hands-on tekkie [sic]."); *id.* at 718 ("Mr. Hager was still a better choice based on his demonstrated managerial, administrative, communication, and coordination skills. Technical INFRA Program skills were certainly not the only things we were looking for.").

In light of this substantial agreement among the panel members, as well as the consistency of their explanations with Mr. Pyron's own, we reject Ms. Conroy's contention that a reasonable jury could find Mr. Pyron's reasons for hiring Mr. Hager pretextual.

**3**

Ms. Conroy's third line of argument focuses on procedural irregularities. She argues that the references listed in Mr. Hager's application were contacted and were utilized by Mr. Pyron in making his decision. By contrast, she says, none of her references was contacted. Had the agency contacted one of her listed references, Tah Yang, Ms. Conroy argues, it would have learned that she was "clearly more qualified for the position than any other candidate, including Mr. Hager." Aplt. Opening Br. at 40

(quoting Aplt. App. at 773 (Aff. of Mr. Yang, dated Aug. 23, 2002)) (internal quotation marks omitted). Ms. Conroy also draws our attention to the fact that Mr. Pyron contacted her supervisor, Ms. Close, who—according to Ms. Conroy—"was not listed as [a] reference." *Id.*

"This court recognizes that disturbing procedural irregularities, including deviations from normal company procedure, provide support for a plaintiff's assertion of pretext." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1138 n.11 (10th Cir. 2003) (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1219–20 (10th Cir. 2002)) (internal quotation marks omitted). However, "[f]or an inference of pretext to arise on the basis of a procedural irregularity, . . . there must be some evidence that the irregularity 'directly and uniquely disadvantaged a minority employee.'" *Johnson*, 594 F.3d at 1213 (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 n.20 (10th Cir. 1995)). We conclude that there was nothing irregular or disturbing in the agency's hiring process.

Forest Service policy gave selecting officials discretion in choosing whether to contact a candidate's references. *See* Aplt. App. at 615 (Forest Serv. Handbook, dated Dec. 20, 2000) ("The selecting official *may* choose to contact references provided by the candidate and factor that information into the selection decision." (emphasis added)). Furthermore, there was no policy prohibiting the agency from contacting a candidate's supervisor. *See id.* at 999 (Dep. of Gloria Jean Banks, Apr. 25, 2008) (agreeing that the selecting official may "seek job-related information about the applicants from any source"). Ms. Conroy's application listed four specific references: Mr. Yang, Milt

-24-

Coffman, Dana Hoskins, and Susan Freeman. *See id.* at 437. In the application, she also answered "YES" to the question, "May we contact your current supervisor?" *Id.* at 432.

Panel member Ms. Brackmann was assigned to contact Ms. Conroy's references. She tried repeatedly to contact Mr. Yang but failed. She knew, however, that Mr. Yang had a favorable view of Ms. Conroy, and she relayed this information to the rest of the panel. *See id.* at 592 ("And so I went back to the panel and said, 'I was unable to reach Tah, but I will speak on his behalf if I may and say that he very much enjoys working with Laura and thinks she's doing a great job.'"). Ms. Brackmann next tried to contact Mr. Coffman but lacked a current phone number for him because he had recently retired. She decided not to contact the third listed reference, Ms. Hoskins. Ms. Brackmann knew that Ms. Conroy and Ms. Hoskins were close friends, and she believed that any recommendation from Ms. Hoskins would lack objectivity and would not be helpful. Finally, Ms. Brackmann could not recall whether she had tried to contact or had spoken with Ms. Freeman. *See id.* Ms. Conroy does not contest the accuracy of Ms. Brackmann's account of her efforts to check references.

As earlier noted, after the panel made its recommendation to Mr. Pyron, Mr. Pyron decided to contact Ms. Conroy's supervisor, Ms. Close. Ms. Close told Mr. Pyron that she agreed with the panel's decision to recommend Mr. Hager. In her view, Mr. Hager was the better candidate. *See id.* at 507.

We perceive nothing irregular in the way that Ms. Brackmann and Mr. Pyron went about contacting Ms. Conroy's references and supervisor. The agency's efforts were

thorough, and we agree with the district court that nothing in Ms. Brackmann's or Mr. Pyron's actions evinces a process "used to perpetuate a subjective evaluation in order to achieve a discriminatory intent." *Id.* at 304. We detect no "deviations from normal company procedure" here. *Doebele*, 342 F.3d at 1138 n.11 (quoting *Garrett*, 305 F.3d at 1220) (internal quotation marks omitted). Indeed, Ms. Conroy specifically authorized the agency to contact Ms. Close. Nor do we find anything disturbing about the agency's actions. There is simply no basis for concluding that these actions "directly and uniquely disadvantaged" Ms. Conroy. *Johnson*, 594 F.3d at 1213 (quoting *Randle*, 69 F.3d at 454 n.20) (internal quotation marks omitted).

We therefore reject Ms. Conroy's arguments and conclude that the particulars of the agency's hiring procedures do not support a claim of pretext.

**4**

Lastly, Ms. Conroy asserts that the use of "subjective criteria" in the Forest Service's hiring process raises a triable dispute as to pretext. Aplt. Opening Br. at 41. She notes that the panel recommended Mr. Hager based on its "assessment that [he] had superior leadership and managerial skills, greater knowledge of the Forest Service's business areas gained while serving on interdisciplinary teams and by working in Ranger Districts and National Forests, and a well-written application." *Id.* (quoting Aplt. App. at 65 (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J., filed July 30, 2008)) (internal quotation marks omitted). According to Ms. Conroy, "[a]ll of these criteria are subjective, with no definitions anywhere in the record or concrete examples of how Hager

demonstrated such qualities more than Conroy." *Id.*

To support her argument, Ms. Conroy relies on our decision in *Garrett*. *Garrett* held that the employer's "subjective evaluation methods" were evidence of pretext. 305 F.3d at 1218. The facts of *Garrett* are striking. The plaintiff-employee, an African-American, had received mainly positive evaluations for seventeen years. However, after forming a pro-diversity group at work, he began receiving increasingly negative evaluations. He was later transferred, was treated differently than his peers, and, "[c]onvinced that he was being set up to fail in this new position," eventually he resigned. *Id.* at 1216. In concluding that the employer's subjective evaluation criteria evinced pretext, we emphasized two things. First, the evaluation process was "wholly subjective," and the employer had "presented no set of objective criteria by which employees [we]re differentiated." *Id.* at 1218. Second, the evaluation process was totally opaque, *see Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1200 (10th Cir. 2008) (discussing the "opaqueness" of "the evaluation system" in *Garrett*); "nowhere in the record [wa]s it shown how [employee] rankings were determined," *Garrett*, 305 F.3d at 1218.

Title VII plaintiffs routinely rely on *Garrett* to support pretext arguments. We, however, have read that decision narrowly, emphasizing its unique facts. *See, e.g.*, *Crowe*, 649 F.3d at 1195 (noting that "*Garrett* presented strikingly different facts" compared to the case at bar); *Hinds*, 523 F.3d at 1200 ("[T]he evaluations at issue here differ in kind from those at issue in *Garrett* . . . ."). Our disinclination to extend *Garrett*'s reach rests on the intuition that our role is "not to act as a super personnel department that

second guesses employers' business judgments." *Jones*, 349 F.3d at 1267 (quoting

*Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321,

1329 (10th Cir. 1999)) (internal quotation marks omitted).

Indeed, *some* subjectivity is to be expected in every hiring decision. "Title VII

does not do away with traditional management rights. An employer has discretion to

choose among equally qualified candidates, provided that the decision is not based upon

unlawful criteria." *Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981) (quoting *Tex.*

*Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981)) (internal quotation marks

omitted); *see also Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 619 (6th Cir.

2003) ("[Differences of opinion among evaluators] is not evidence that either [evaluator]

based his or her evaluation on anything other than his or her honest assessment of the

[employee]. Rather, it simply indicates that the two individuals disagree as to subjective

factors, which one would expect might happen from time to time."). Thus, we "typically"

will infer pretext from the employers' use of subjective evaluation criteria in the hiring

process "only when the criteria on which the employers ultimately rely are *entirely*

subjective in nature." *Jones*, 349 F.3d at 1267–68. And, in determining if this is so, we

will carefully evaluate whether "the opaqueness" of the employers' hiring system makes

it "susceptible to unspoken discriminatory input," *Hinds*, 523 F.3d at 1200.

Nothing of the sort is present here. The candidates' qualifications were assessed in

light of five KSAs. The KSAs were made known to the candidates, and the candidates

submitted narratives explaining why their skills and experience matched up with each

-28-

KSA.  *See* Aplt. App. at 434–37 (Conroy Appl., filed July 30, 2008); *id.* at 681–85 (Hager Appl. Package, filed July 30, 2008).  The record shows that the selection panel used the KSAs and the candidates' narratives in performing the evaluations.  Unlike in *Garrett*, "the evaluation system here was transparent and reflected that all listed employees were evaluated according to the same criteria . . . and assessed in non-discriminatory terms." *Hinds*, 523 F.3d at 1200.  Furthermore, we are not troubled by the fact that some panel members attached differing weight to different KSAs.  "Indeed, it is because we expect individuals to disagree with respect to subjective factors that we frequently employ more than one individual to evaluate subjective criteria, as the [Forest Service] did here." *Sutherland*, 344 F.3d at 619.

In short, the agency's evaluation methods were not "wholly subjective" and were not at all opaque.  *Garrett*, 305 F.3d at 1215.  We conclude that Ms. Conroy has failed to demonstrate pretext on this basis.

In sum, none of the evidence that Ms. Conroy has advanced is sufficient to raise a "genuine doubt about [the Forest Service's] motivation" in selecting Mr. Hager.  *Santana*, 488 F.3d at 866 (quoting *Horizon/CMS Healthcare*, 220 F.3d at 1200) (internal quotation marks omitted).  We therefore reject Ms. Conroy's primary claim of sex discrimination.

**B**

We turn now to what is, at best, a secondary claim of sex discrimination pertaining to the 2001 hiring process.  In her opening brief, Ms. Conroy asserts that the Forest Service's decision to relax the qualification standards for the position and readvertise

it—after she had already applied for it and been found qualified—constituted a separate act of sex discrimination.

It is far from clear whether Ms. Conroy advanced this argument as a separate *claim* in her complaint.[4] We will assume *arguendo* that she did because we can comfortably reject the claim on the merits.

As with Ms. Conroy's primary discrimination claim, the burden-shifting framework of *McDonnell Douglas* applies to this secondary claim. As noted, the parties do not contest that Ms. Conroy has made out her prima facie case.[5] Thus, the burden

_____

[4]     A single numbered paragraph in Ms. Conroy's complaint read as follows:

> Plaintiff is female, and experienced discrimination from Defendant because of her gender in 2001, when she was not considered for the INFRA Program Manger position, and when a male with less experience and knowledge related to the position than she had was selected for the job.

Aplt. App. at 23 (Compl., filed Dec. 29, 2006). In her opposition to the agency's motion for summary judgment, Ms. Conroy's 2001 discrimination claim appeared to focus solely on her ultimate non-selection. *See id.* at 121 ("As discussed below, Conroy can present substantial evidence from which a reasonable juror could determine that her non-selection was based on discrimination rather than Hager's superior qualifications.").

Later in her opposition brief, however, Ms. Conroy did state that "the Agency did not even offer a legitimate reason for reducing the qualifications and re-advertising the position." *Id.* at 124. In a footnote in its opinion, the district court addressed and rejected Ms. Conroy's argument: "The case law requires the Agency to offer a legitimate and non-discriminatory reason for Ms. Conroy's rejection. This is broader and more easily met than requiring an individual analysis of every step taken throughout the process, such as reducing the qualification[s] or re-advertising the position." *Id.* at 297 n.35.

[5]     We assume without deciding that readvertising a job opening with different (here, reduced) qualifications standards is the kind of adverse employment action that

(continued...)

-30-

shifts to the Forest Service to articulate a legitimate, nondiscriminatory reason for its decision to lower the qualification standards and readvertise the INFRA Program Manager position.

The Forest Service has offered such a reason. It explained that the original pool of quality applicants, which consisted of only two people (Ms. Conroy and one other), was too small. Larry Larson, the head of the Region 4 group where the new position would be located, wanted "as large and diverse an applicant pool as possible" and felt that "some of the unnecessary qualifications for the position"—particularly, an overemphasis on technical skills—"were arbitrarily restricting the applicant pool." Aplt. App. at 349 (Aff. of Mr. Larson, dated July 28, 2008). The vacancy announcement was revised to produce a larger pool of qualified applicants. According to Mr. Larson and other Forest Service personnel, this practice was common when a job posting initially draws too few qualified applicants. *See id.*; *id.* at 996 (Dep. of Valerie Del Rio, Apr. 17, 2008); *id.* at 999 (Dep. of Ms. Banks, Apr. 25, 2008).

We find this explanation both legitimate and nondiscriminatory, so the burden

---

[5](...continued)
would permit a plaintiff to establish a prima facie of discrimination under Title VII. *See Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1142–43 (9th Cir. 2001) (following application by female employee, supervisor readvertised job position, changed job requirements to fit male employee's strengths, then hired male employee; the court noted the parties' agreement that plaintiff had established a prima facie case of discrimination).

shifts to Ms. Conroy to show that the proffered reason is pretextual.[6] *See Jones*, 349 F.3d

at 1266 (noting that, at the second stage of *McDonnell Douglas*, the employer need only

"explain its actions against the plaintiff in terms that are not facially prohibited by Title

VII" (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1317 (10th Cir. 1992)) (internal

quotation marks omitted)).  Ms. Conroy's only argument on this front is that the agency's

actions—relaxing the qualification standards and readvertising the position—are contrary

---

[6]    Ms. Conroy argues that the agency's initial memorandum brief in support of its motion for summary judgment did not provide any explanation for its relisting of the position.  She says that only after she highlighted this failure in her opposition brief did the agency, in its reply brief, offer an explanation.  She complains that this belated justification deprived her of the opportunity to dispute it and that, as a result, the district court should have found the agency's burden under *McDonnell Douglas* unsatisfied.

We can hardly fault the Forest Service if it failed initially to perceive that Ms. Conroy was raising a *separate* sex discrimination claim pertaining to the spring 2001 relisting, as opposed to a single claim pertaining to her ultimate non-selection in fall 2001.  We ourselves had trouble discerning a separate claim.  *See supra* note 4 and accompanying text.  In any event, the district court did not err in considering arguments in the agency's reply brief.  "Whether a non-moving party has had an opportunity to respond to a moving party's reply brief at the summary judgment stage is a 'supervision of litigation' question that we review for abuse of discretion."  *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1191–92 (10th Cir. 2006).  Our case law makes clear that a district court abuses its discretion only when it both denies a party leave to file a surreply *and* relies on new materials or new arguments in the opposing party's reply brief.  *See id.*; *Doebele*, 342 F.3d at 1139 n.13; *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164–65 (10th Cir. 1998).  Ms. Conroy never sought leave to file a surreply, though nearly two years passed between the filing of the agency's reply brief and the district court's decision.  In the interim, Ms. Conroy "had plenty of opportunity to seek leave of the court to file a surreply but never attempted to do so."  *Pippin*, 440 F.3d at 1192.  Accordingly, the district court did not abuse its discretion in considering and relying upon the agency's explanation for readvertising the position.  And, thus, that explanation also is a proper consideration for this court; because we find it sufficient, it operates to shift the burden back to Ms. Conroy to show pretext.

to Forest Service policy and practice. But this assertion is belied by the record. Agency policy provides that when there is an insufficient number (namely, three or fewer) of qualified applicants, a personnel specialist may either certify all applicants as qualified and forward their names to the selecting official, or advise the selecting official of "viable options." Aplt. App. at 631 (Forest Serv. Handbook, dated July 20, 2000). The uncontroverted testimony of agency officials establishes both that these "viable options" included relisting a vacancy announcement with revised qualification standards and that it was common practice for the agency to do just that. *See id.* at 349, 996, 999.

Ms. Conroy objects that "there is no legitimate reason to lower the minimum qualifications simply to get more applicants qualified, particularly when there are already applicants who are 'well-qualified' under the original qualification standard." Aplt. Opening Br. at 32. As we understand it, Ms. Conroy's argument is that changing a job description to attract more or different candidates, when perfectly qualified candidates have already applied for the position, is illegitimate per se under Title VII. We are aware of no rule of law that supports that proposition.[7] Of course, the door remains open to plaintiffs like Ms. Conroy to show that an employer's *reasons* for relisting a position are pretextual and that the relisting was in fact used to discriminate. But on the record in this case, Ms. Conroy has failed to make that showing.

---

[7] And we reiterate that we are expressly leaving open the question whether readvertising a job vacancy under a revised description, without more, can even constitute an adverse employment action. *See supra* note 5.

We conclude that no reasonable jury could find the Forest Service's explanation for readvertising the position was unworthy of belief and pretextual. We therefore reject Ms. Conroy's secondary claim of sex discrimination.

Based on the foregoing, the district court did not err in granting summary judgment for the Forest Service on Ms. Conroy's two claims of sex discrimination pertaining to the 2001 hiring process.

**IV**

Ms. Conroy also has asserted a retaliation claim arising out of the 2004 hiring process. After Mr. Hager left the INFRA Program Manager position in 2003, the Forest Service announced the vacancy in February 2004. This time, however, it advertised the position only in the professional series, rather than in both the professional and administrative series, as it had done in 2001. Ms. Conroy applied for the newly vacant position but was found unqualified because she lacked a college degree or equivalent professional experience. She claims that the agency's decision to advertise in the professional series was designed to exclude her and was motivated by a desire to retaliate against her for the discrimination complaint she filed with the agency after her non-selection in 2001.

Under *McDonnell Douglas*, Ms. Conroy must first make out a prima facie case of retaliation. To do so, she "must show: '(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected

activity and the materially adverse action.'" *Tabor v. Hilti*, --- F.3d ---, No. 11-5131, 2013 WL 150225, *8 (10th Cir. Jan. 15, 2013) (quoting *Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)); *see O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001). The Forest Service argues that Ms. Conroy's prima facie case fails under the third factor—causation. We agree.

Under our precedent, the requisite causal connection may be shown by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *O'Neal*, 237 F.3d at 1253 (quoting *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982)) (internal quotation marks omitted). Where, however, "very close temporal proximity between the protected activity and the retaliatory conduct" is lacking, "the plaintiff must offer additional evidence to establish causation." *Id.* As we explain below, we conclude that Ms. Conroy has failed to establish the requisite temporal proximity, and her additional evidence of causation is unpersuasive. She has failed, therefore, to make out a prima facie case of retaliation.

## A

In addressing retaliation claims, our cases have never established a precise temporal line for purposes of determining whether the requisite proximity is present to establish—at the prima facie stage—the causation element. It appears clear that, if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference; but it is equally patent that if the adverse action occurs three months out and

beyond from the protected activity, then the action's timing alone will not be sufficient to establish the causation element. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation." (citations omitted)). However, where along the temporal line beyond one and one-half months but short of three months, the adverse action's timing ceases to be sufficient, standing alone, to establish the requisite causal inference is less than pellucid. *See, e.g.*, *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (suggesting that "two months and one week" was "*probably* too [long] . . . to establish causation by temporal proximity alone" (emphasis added)).

We need not concern ourselves with this causation question here, however, because the agency action that disadvantaged Ms. Conroy is plainly beyond the three-month mark. Ms. Conroy filed her discrimination complaint in March 2002. The Forest Service announced the new vacancy—limiting it to the professional series—in February 2004, nearly two years later. By itself, that period of time is "too temporally remote to support an inference of causation." *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1182 (10th Cir. 2006).

Ms. Conroy seeks to avoid this conclusion by arguing that the total amount of time between her March 2002 agency discrimination complaint (that is, her protected activity) and the February 2004 job posting is "meaningless" because "the Agency had no reason

or opportunity to reclassify the position during those two years." Aplt. Opening Br. at 44. What matters, in her view, "is how quickly [the agency] acted once it did have a reason and opportunity to reclassify the position." *Id.* Ms. Conroy thus pinpoints the relevant start and end dates as December 12, 2003—the day the agency learned of her intention to apply for the newly vacant position—and January 27, 2004—the day that agency personnel decided to classify the position solely in the professional series. The intervening period amounts to forty-six days or, assuming a thirty-one-day month, one month and fifteen days—a period of time that would barely be sufficient under our precedent, standing alone, to raise the requisite inference of causation. *See Anderson*, 181 F.3d at 1179 (stating that a one-and-a-half-month period "by itself" establishes causation).

We are not persuaded, however, by Ms. Conroy's argument. As the government correctly notes, Ms. Conroy's argument "ignores the rationale behind the temporal proximity doctrine." Aplee. Br. at 51. Underlying the law's recognition that a sufficient causal inference may arise from adverse action shortly following protected activity is the notion that such action typically is the product of negative emotions such as anger or resentment. *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1217 (10th Cir. 2003). Yet, our ability to draw such a causal inference from an employer's adverse action diminishes over time because we may reasonably expect (as a matter of common sense) that the embers of anger or resentment that may have been inflamed by the employee's protected activity—emotions that would underlie any retaliatory adverse action—would

cool over time. *See id.* at 1217 ("[A]nger or resentment—the motivation for possible

retaliation—is an emotion that tends to diminish with time."). Therefore, generally we

measure the temporal period as running from the date of the protected activity to the date

of the adverse action because this approach allows us to more accurately assess whether

an employer's adverse action likely was motivated by the employer's protected activity

(that is, whether the protected activity likely caused the adverse action).[8]

Ms. Conroy's proposed approach stands at odds with this temporal-proximity,

causation rationale. That is because she would have us ignore the time period shortly

following her protected activity—the precise period when we ordinarily would expect any

anger or resentment that her activity engendered in the Forest Service to be at its

apex—and instead focus on a period almost two years removed from her protected

activity merely because it was at that point that the Forest Service had its first opportunity

to retaliate against her by taking a very specific adverse action—readvertising the INFRA

---

[8]     To be sure, we have recognized an exception to this approach for "unique circumstances," such as when a plaintiff is absent from work during significant periods between the protected activity and the adverse action, which may require adjustment of the time-lapse calculation. *See Wells*, 325 F.3d at 1217. In such a circumstance, even if the employer harbors anger or resentment due to the employee's protected activity, the employee is unlikely to be a ready target for the employer's adverse action. *See id.* ("Even if [the employer] had a desire to retaliate for the November complaints, it did not make sense for him to do so until Plaintiff returned to work."). Ms. Conroy cannot avail herself of this exception, however. She has not alleged that she was absent from her job at the Forest Service during any significant period during the relevant time frame—March 2002 to February 2004. Nor has she demonstrated that she was otherwise effectively insulated in some comparable fashion from retaliation by the Forest Service during this period.

position solely in the professional series. Yet, Ms. Conroy has not explained why one might reasonably expect the Forest Service's purported retaliatory animus to have continued to burn hot over such a lengthy period of time. As we stated in *Wells*, "When retaliation for an act occurs well after the act, one wonders why the retaliator failed to act sooner." 325 F.3d at 1217. Nor has Ms. Conroy attempted to explain why the Forest Service—even if it harbored retaliatory animus against her—would have viewed the readvertising of the INFRA position in the professional series as the only possible or acceptable means to act on its animus. In particular, the government points out, *see* Aplee. Br. at 51, *and* Ms. Conroy does not dispute, that the Forest Service had multiple opportunities to retaliate against Ms. Conroy in a variety of ways, such as demotion or transfer, before February 2004 when it readvertised the INFRA position. And, under our temporal-proximity, causation rationale, we reasonably would have expected the Forest Service to do so if it in fact harbored retaliatory animus toward Ms. Conroy. But it did not do so.

In sum, Ms. Conroy's temporal-proximity argument constitutes an unwarranted conceptual departure from our precedent and is unpersuasive. Therefore, we reject her effort to adjust the relevant time frame for the purpose of analyzing the causation issue; it remains March 2002 to February 2004—the dates of Ms. Conroy's protected activity and the Forest Service's adverse action, respectively. From that lengthy period of time, alone, we cannot infer that Ms. Conroy's protected activity was the cause of the Forest Service's asserted adverse action. Accordingly, Ms. Conroy must rely upon "additional evidence"

in order to make out her prima facie case.  *O'Neal*, 237 F.3d at 1253.

## B

In examining Ms. Conroy's additional evidence of causation, it bears mention at the outset that the Forest Service had good reasons to limit the 2004 vacancy announcement to the professional series.  An intervening policy change prohibited the interchangeable listing that the agency had utilized in 2001, and by 2004, the agency had to make a choice: list the position in the administrative series or list it in the professional series, but not both.

Two individuals were responsible for making this decision.  The first was Steve Solem, the head of the group where the position would be located; and the second was Donald Fullmer, the immediate supervisor for the position.  Both had entered their positions in 2002, and neither had been involved in Mr. Hager's 2001 selection, although both were aware of Ms. Conroy's agency discrimination complaint regarding that selection.  Messrs. Solem and Fullmer testified that they ultimately opted for the professional series because, in the prior two years, the "position had continued to develop into a position requiring more analysis and interpretation of data for the benefit of management," Aplt. App. at 324 (Decl. of Mr. Solem, dated Mar. 29, 2007), and the users of the data "were primarily professionals in various functional areas," *id.* at 525 (Dep. of Mr. Fullmer, Apr. 18, 2008).

Ms. Conroy first attempts to draw a causal link between her discrimination complaint and the 2004 readvertisement by pointing to purported "admi[ssions]" by

-40-

certain agency personnel that the INFRA Program Manager position did not require a college degree. Aplt. Opening Br. at 45. We fail to see how this is relevant since the Forest Service never maintained that a college degree was required. Professional series positions require *either* a college degree or an equivalent level of professional experience. Ms. Conroy failed to qualify for the position in 2004 because she lacked both. *See* Aplt. App. at 697–701 (Decl. of Ms. Del Rio, dated Mar. 30, 2007) (noting that Ms. Conroy could have qualified in 2004 if she (1) had a college degree, (2) had an equivalent combination of education and experience, *or* (3) had "four years of appropriate experience," but that she failed on all three grounds).

Ms. Conroy's second attempt fares no better. She contends that Mr. Fullmer "had adopted a negative view of her and accused [her] of refusing to work with Hager after he became INFRA Program Manager." Aplt. Opening Br. at 45. As support, she points to the testimony of Ms. Brackmann, who said that Mr. Fullmer told her about Ms. Conroy's strained working relationship with Mr. Hager. Apparently, Mr. Fullmer was aware that it had not been a "pretty scene" when the newly installed Mr. Hager introduced himself to Ms. Conroy; that Ms. Conroy refused to work with Mr. Hager; and that Ms. Conroy was heard "screaming" over the telephone as she complained to a coworker about Mr. Hager's selection. Aplt. App. at 901–02. To the extent that this evidence established that Mr. Fullmer had a "negative view" of Ms. Conroy, Aplt. Opening Br. at 45, it fails to show causation. Mr. Fullmer's view was evidently shaped by Ms. Conroy's alleged conduct at the office following her non-selection, *not* by her March 2002 discrimination complaint.

Thus, again, Ms. Conroy fails to draw the requisite causal link between the protected activity and the adverse action.

In a last-ditch effort, Ms. Conroy points to evidence that post-dates all of these events. She notes that Region 4's INFRA Program Manager position became available again in 2008 and that the Forest Service decided to combine the position with the equivalent position in Region 2 and locate the new position in Denver. Ms. Conroy believes this is further evidence of the agency's retaliatory motive. Her only support for this charge is her own declaration in the district court, which reads as follows: "One of my colleagues in Denver, Bridget Roth, told me that the acting INFRA Program Coordinator at that time in Region 2, Pam DeVore, told her that the reason that the Agency was not advertising the combined INFRA Program Manager position in Utah was due to my complaint against the Agency." *Id.* at 804 (Decl. of Ms. Conroy, dated Feb. 9, 2009).

For obvious reasons, we must discount the reliability of this double-hearsay evidence. *Cf. Jones v. Unisys Corp.*, 54 F.3d 624, 632 (10th Cir. 1995) ("This stray [double-hearsay] remark by someone not in a decision-making position does not establish intent to discriminate."). Even if we were to credit it, the *most* that it might show is a causal link between Ms. Conroy's 2002 protected activity and the *2008* relisting. However, our review of Ms. Conroy's complaint shows that she most certainly has not asserted a separate retaliation claim arising out of the 2008 relisting. We therefore find Ms. Conroy's evidence both untrustworthy and irrelevant to her 2004 retaliation claim,

and we conclude that she has failed to establish causation on this ground.

Absent causation, Ms. Conroy cannot establish a prima facie case of retaliation. And absent a prima facie case, the Forest Service is entitled to summary judgment. We thus conclude that the district court did not err in granting summary judgment to the Forest Service on Ms. Conroy's claim of retaliation pertaining to the 2004 hiring process.

**V**

We **AFFIRM** the judgment of the district court.