FILED
**United States Court of Appeals
Tenth Circuit**

**PUBLISH**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

**February 8, 2023**

**Christopher M. Wolpert
Clerk of Court**

DARREN MARKLEY,

     Plaintiff - Appellant,

v.

U.S. BANK NATIONAL ASSOCIATION,
d/b/a US Bank,

     Defendant - Appellee.

No. 21-1240

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:19-CV-01130-RM-NYW)**
_____

Gary J. Benson, Dworkin, Chambers, Williams, York, Benson & Evans, P.C. (Sean J. O'Brien with him on the briefs), Denver, Colorado, for Plaintiff – Appellant.

Marko Mrkonich, Littler Mendelson, P.C., Minneapolis, Minnesota (Danielle L. Kitson and Kelsey A. VanOverloop, Littler Mendelson, P.C., Denver, Colorado, on the brief), for Defendant – Appellee.

_____

Before **HOLMES**, Chief Judge, **McHUGH**, and **EID**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

U.S. Bank National Association ("U.S. Bank") employed Darren Markley as Vice President and Managing Director of Private Wealth Management at its Denver, Colorado location. Mr. Markley managed a team of wealth managers and private bankers,

including Bob Provencher and Dave Crittendon, when issues arose in mid-2017. First, Mr. Markley, in violation of U.S. Bank policy, provided Mr. Provencher a personal loan. Second, Mr. Markley allegedly prevented Mr. Crittendon from "sandbagging" an investment, a practice where a banker carries a transaction over to a new reporting period to help meet sales goals. Third, members of Mr. Markley's team, including Mr. Crittendon, accused Mr. Markley of giving Mr. Provencher commission credits for sales on which Mr. Provencher did not participate and had not met the clients.

U.S. Bank investigated the allegation against Mr. Markley regarding unearned commissions first, having Mr. Markley complete an audit spreadsheet that asked whether Mr. Provencher was present for "client meetings." Mr. Markley responded with an unqualified affirmative as to each client. As these answers were inconsistent with Mr. Crittendon's accusation, U.S. Bank commenced a formal investigation into the matter, selecting Mario Plazola as the internal investigator. Mr. Plazola interviewed nine members of Mr. Markley's team, as well as Mr. Provencher and Mr. Markley. Although Mr. Markley generally denied wrongdoing and attributed the allegations to retaliation for him stopping Mr. Crittendon's sandbagging attempt, the majority of his team, as well as Mr. Provencher, provided statements indicating Mr. Provencher was not present for all client meetings and had never met some of the clients. Mr. Plazola drafted a report summarizing his investigation and provided it to a review committee that concluded the allegations against Mr. Markley were substantiated. A separate misconduct disciplinary committee unanimously voted to terminate Mr. Markley's employment. At no time

during the investigation did Mr. Markley suggest the allegations against him were motivated by his age.

Over a year later, Mr. Markley filed suit, advancing a claim under the Age Discrimination in Employment Act ("ADEA") and a wrongful discharge claim under Colorado law. U.S. Bank moved for summary judgment. As to the ADEA claim at issue in this appeal, the district court concluded Mr. Markley did not sustain his burden of producing evidence capable of establishing that U.S. Bank's reason for terminating his employment—improperly giving Mr. Provencher commission credits—was pretext for age discrimination. On appeal, Mr. Markley contends U.S. Bank, by way of Mr. Plazola, conducted a "sham" investigation, and this establishes pretext. For two reasons, we reject Mr. Markley's assertion. First, while an imperfect investigation may help support an inference of pretext, there must be some other indicator of protected-class-based discrimination for investigatory flaws to be capable of establishing pretext. Otherwise, a jury would be forced to speculate about the cause of the investigatory flaws. Second, even if deficiencies in an investigation alone could support a finding of pretext, Mr. Markley's criticisms of the investigation are unpersuasive and insufficient to permit a reasonable jury to find U.S. Bank's reasons for termination pretextual. Accordingly, we affirm the district court's grant of summary judgment.

## I.     BACKGROUND

### A.     *Factual History*

In 2009, U.S. Bank hired Mr. Markley as a Private Wealth Management Market Leader at its Denver, Colorado location. In late 2010 or early 2011,

3

Mr. Markley hired Mr. Provencher as a member of his team. Mr. Provencher served as a Private Wealth Consultant. As compensation, Mr. Provencher received weighted commissions, earning a 125% commission for new client business but only 25% for existing client business.

By June 2017, Mr. Provencher found himself in personal financial trouble and asked Mr. Markley for an advance on a commission. Contrary to U.S. Bank policy, Mr. Markley gave Mr. Provencher a personal loan of $10,000. U.S. Bank learned of Mr. Markley's loan to Mr. Provencher and issued Mr. Markley a written warning for a code of ethics and business conduct violation. The written warning instructed Mr. Markley to "[a]dhere to all sections of the U.S. Bank Code of Ethics and Business Conduct" and stated that "there must be no additional issues regarding your performance. Failure to meet the expectation outlined may result in further disciplinary action, up to and including termination of your employment." App. Vol. 5 at 229.

Despite Mr. Markley's loan, Mr. Provencher continued to experience financial issues. In late 2017 or early 2018, Mr. Crittendon, a member of Mr. Markley's wealth management team, raised concerns about sales credit practices on the team. Mr. Crittendon alleged Mr. Markley (1) pressured team members to include Mr. Provencher on sales and (2) listed Mr. Provencher on sales for which he was not involved so that Mr. Provencher could receive sales credit and commissions for those sales.

To investigate the matter, Rene Santanni, the Chief of Staff for the President of the Private Wealth Management Group in Denver, initiated an audit, having Mr. Markley

complete a spreadsheet that asked about Mr. Provencher's involvement with certain client accounts. Specifically, the spreadsheet asked Mr. Markley if Mr. Provencher was "present at client meeting*s*" for each client. App. Vol. 4 at 42–43 (emphasis added). Mr. Markley marked that Mr. Provencher was present at client meetings for all the clients. And, although the spreadsheet provided a "Notes" column and asked what work Mr. Provencher "perform[ed] to generate the new [o]pportunity," Mr. Markley did not qualify any of his answers affirming Mr. Provencher attended client meetings for each client. *Id.* Ms. Santanni concluded Mr. Markley's responses contained inaccuracies and were inconsistent with Mr. Crittendon's complaint. As a result, Ms. Santanni referred the matter to the U.S. Bank Fraud Investigation Unit.

U.S. Bank tasked Mr. Plazola with the investigation. As the investigation was taking shape, Mr. Markley gave a PowerPoint presentation to his team, which included a slide directing team members to include Mr. Provencher on sales and to refer all new clients to Mr. Provencher. Also early in the investigation, Michael Ott, one of Mr. Markley's supervisors, spoke with Mr. Plazola and indicated he was ready to terminate Mr. Markley based on the personal loan to Mr. Provencher and the PowerPoint slide. Mr. Ott also expressed his desire for a quick investigation because he planned to be in Denver in late-February and hoped to terminate Mr. Markley then. Mr. Plazola did not meet Mr. Ott's deadline.

Over the course of approximately one month, Mr. Plazola (1) performed internet searches about Mr. Markley and Mr. Provencher, including obtaining copies of their social media pages; (2) reviewed emails sent by Mr. Markley and Mr. Provencher,

including emails related to Mr. Provencher's personal financial issues that showed

Mr. Provencher was in urgent need of over $12,000; (3) reviewed the audit spreadsheet;

(4) interviewed nine employees on Mr. Markley's team; and (5) interviewed

Mr. Provencher and Mr. Markley. Almost all of the interviewed team members indicated

that Mr. Markley was trying to push sales toward Mr. Provencher by including

Mr. Provencher on all sales. Further, six of the nine employees provided information

contrary to Mr. Markley's audit spreadsheet statements about Mr. Provencher's

involvement in certain sales. One of those six individuals, Benjamin Sawyer, defended

Mr. Provencher's contributions to the team but acknowledged that Mr. Provencher "was

added to a sale he did not participate in." *Id.* at 52. John Romero, another member of

Mr. Markley's team, similarly had complimentary comments about Mr. Provencher's

contributions to the team but stated that Mr. Provencher "was added to a sale that he did

not have anything to do with." *Id.* at 69. Tiffani Boskovich and Zach Nicol likewise

stated that Mr. Provencher was receiving credit for sales to which he did not directly

contribute.

Mr. Plazola also interviewed Mr. Markley and Mr. Provencher. Both generally

denied wrongdoing; but Mr. Provencher admitted he was not present for some of the

client meetings. Mr. Markley, on the other hand, attributed his team's interview responses

to his effort in December 2017 to stop Mr. Crittendon from "sandbagging" sales, and

suggested the complaint about Mr. Provencher receiving unearned sales credit was

retaliatory.[1] Mr. Markley's allegation of attempted sandbagging, however, initially extended only to Mr. Crittendon's actions with respect to a single client.[2] Mr. Markley did not raise any sandbagging allegations against Mr. Sawyer, Mr. Romero, or Mr. Nicol.[3] Finally, Mr. Plazola's notes indicate Mr. Markley expressed the sentiment that "it was ok for [Mr. Provencher] to receive commission on a sale [Mr. Provencher] was not involved in due to the anticipation of future sales [Mr. Provencher] was going to bring in with the client." *Id.* at 61.

Mr. Plazola prepared a draft report summarizing his investigation, which was later condensed down to a one-page case summary. In pertinent part, the report stated:

> The business line conducted a subsequent audit of [Mr.] Provencher's sales and requested [Mr.] Markley's justification for credited sales occurring between 01/2017 and 11/2017. [Mr.] Markley reported that [Mr.] Provencher was present at all client meetings for these sales. During investigative interviews, six Private Wealth Management employees identified eight sales in which [Mr.] Provencher had no involvement but was awarded sales credit. . . . [Mr.] Provencher and [Mr.] Markley denied wrongdoing and stated that [Mr.] Markley's business strategy was to include [Mr.] Provencher in all new client sales. [Mr.] Provencher was unable to provide specific and matching details of client meetings that were communicated by recipients of the joint sales credit. He acknowledged that he did not always meet with a client but stated that his involvement was

---

[1] "Sandbagging" is the practice of carrying a sale over into a new calendar year/reporting period to help a wealth manager hit time-specific portfolio and sales goals. *See* App. Vol. 6 at 207 (discussing form of sales misconduct where a manager "[w]ait[s] to open customer requested accounts due to sales campaigns or to push it to the following reporting period").

[2] During a subsequent interview, Mr. Markley expanded his attempted sandbagging allegation to include Ms. Boskovich and Amy Kane.

[3] At this time, Mr. Markley was unaware of who had asserted Mr. Provencher received credits for unearned sales, and Mr. Plazola declined to answer Mr. Markley's inquiry on this front.

required to push the sale forward and that he added value by scheduling calls or giving guidance to others. [Mr.] Markley stated that [Mr.] Provencher added value to all client sales regardless of his occasional limited involvement in client meetings or actions to drive the sale. [Mr.] Markley stated that [Mr.] Provencher also received credit for sales if he had the intention to sell other bank products and services to that customer at a later time.

* * *

The investigation found that [Mr.] Markley communicated to his team via a PowerPoint presentation on 2/7/2018 that all new clients will be funneled through [Mr.] Provencher, regardless of where the client was sourced. This direction does not align with the Business Line's sales strategy and philosophy as confirmed by Private Wealth Management Head Michael Ott. [Mr.] Provencher and [Mr.] Markley received written warnings in 08/2017 for a personal loan in the amount of $10,000 that was made by [Mr.] Markley to [Mr.] Provencher.

App. Vol. 5 at 279. The report went on to identify the "[r]oot [c]ause" of the action as "[d]eliberate, unethical, or dishonest act." *Id.* at 280. It also stated that Mr. Ott, Alison Hach (an HR employee), and Jeff Wahl (vice president, division manager) all recommended U.S. Bank terminate Mr. Markley's employment.

The Sales Misconduct SAR Review Committee ("Review Committee") concluded the allegations in the report were "substantiated." App. Vol. 2 at 107. As a result of the Review Committee's conclusion, the matter was forwarded to the Sales Misconduct Disciplinary Oversight Committee ("SMDOC") on March 1, 2018. A three-member SMDOC panel, composed of Katherine Lawler, Justin Windschitl, and Jodi Richard, unanimously agreed with the recommendation to terminate Mr. Markley. The SMDOC members did so via email, within two-and-a-half hours of receiving the investigation report forwarded from the Review Committee. The SMDOC members were not acquainted with Mr. Markley and did not know his age. U.S. Bank terminated

8

Mr. Markley's employment on March 2, 2018. At the time of his termination, Mr. Markley was age fifty-five, Mr. Ott was age fifty-seven, and the employee who replaced Mr. Markley was in her mid-forties. Mr. Markley concedes he never heard Mr. Ott make any age-related comments, has no evidence that Mr. Ott treated younger employees more favorably, and does not allege that any individual who made an allegation against him or decided to terminate his employment was motivated by age discrimination. App. Vol. 1 at 138–42.

### B.    *Procedural History*

Mr. Markley filed a charge of discrimination with the EEOC and received a right to sue letter. Mr. Markley then filed a complaint in federal court raising two claims: (1) a discrimination claim under the ADEA, and (2) a wrongful discharge claim under Colorado law. U.S. Bank moved for summary judgment. Relative to the ADEA claim at issue in this appeal, U.S. Bank argued, in part, that it had a legitimate business reason for terminating Mr. Markley's employment based on his improper loan to Mr. Provencher, followed by him improperly listing Mr. Provencher on sales in which he did not participate. U.S. Bank further argued Mr. Markley could not establish that its reasons for terminating his employment were pretext for age discrimination. Mr. Markley contended he could demonstrate pretext because "(1) US Bank's investigation into allegations of sales misconduct was not conducted in good faith; (2) US Bank's rationale for

termination is false and inconsistent with facts known at the time; [and] (3) US Bank disregarded its own policies."[4] App. Vol. 1 at 69–70.

After setting out the *McDonnell Douglas* framework,[5] the district court made several statements, including that Mr. Markley's allegations of age discrimination were conclusory and unsupported, Mr. Ott was older than Mr. Markley, and Mr. Markley failed to allege or present evidence that the members of the Review Committee or SMDOC harbored any age-based bias or even knew Mr. Markley's age. The district court then focused on the pretext prong of the *McDonnell Douglas* framework. The district court disagreed with Mr. Markley's contention that U.S. Bank conducted a predetermined investigation. In support of this conclusion, the district court identified the investigatory steps taken by Mr. Plazola, including the interviews of numerous members of Mr. Markley's team who alleged Mr. Markley listed Mr. Provencher as receiving commissions for sales in which Mr. Provencher was not involved, and that Mr. Markley "was given multiple opportunities to provide his perspective on the relevant conduct." *Id.* at 177. The district court also discounted Mr. Markley's contention that U.S. Bank did not follow its own policies by not investigating Mr. Markley's sandbagging allegation because U.S. Bank looked into the allegation and concluded no sandbagging occurred.

---

[4] Mr. Markley also argued that "US Bank treated a similarly situated employee differently." App. Vol. 1 at 70. The district court rejected this argument, stating that Mr. Markley failed to provide "context or evidentiary support" for this argument. *Id.* at 180. On appeal, Mr. Markley does not persist with his similarly-situated-employee argument.

[5] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

For these reasons, the district court granted U.S. Bank summary judgment on Mr. Markley's ADEA claim.[6] This appeal followed.

On appeal, Mr. Markley argues the district court failed to construe the facts in the light most favorable to him when discussing and analyzing the investigation conducted by Mr. Plazola. Mr. Markley also contests whether U.S. Bank's termination decision was independent, arguing SMDOC acted as a rubber stamp and ratified the termination recommendation without any independent analysis. Along these lines, Mr. Markley contends Mr. Ott tainted the investigation by telling Mr. Plazola early in the investigation that Mr. Ott intended to terminate Mr. Markley. Thus, Mr. Markley argues the age-based bias of Mr. Ott can be imparted on to U.S. Bank's decision to terminate his employment. Finally, Mr. Markley contends U.S. Bank failed to follow its own policies when it did not investigate his claim that the allegations against him were leveled in retaliation for him stopping sandbagging.

## II.   DISCUSSION

After laying out the standard of review and the framework governing review of an ADEA claim, we then analyze Mr. Markley's arguments. We conclude (1) alleged imperfections in an investigation are not sufficient, on their own, to support a finding of pretext; (2) even if deficiencies in an investigation could support a finding of pretext, Mr. Markley has, at best, demonstrated Mr. Plazola conducted an imperfect investigation,

---

[6] The district court also declined to take supplemental jurisdiction over Mr. Markley's state-law wrongful discharge claim, dismissing the claim without prejudice. On appeal, Mr. Markley does not challenge the dismissal of his state-law claim.

not a deficient investigation; and (3) Mr. Markley has not advanced other evidence capable of supporting a finding of pretext. Accordingly, we affirm the district court's grant of summary judgment.

### A.    Standard of Review

We review the district court's rulings on summary judgment de novo, applying the same standard as the district court. *See Universal Underwriters Ins. Co. v. Winton*, 818 F.3d 1103, 1105 (10th Cir. 2016). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In reviewing the facts, at summary judgment, the party who bears a burden of proof on an issue bears the burden of production rather than the burden of persuasion. *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1115 (10th Cir. 2007). On appeal, "[w]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1077 (10th Cir. 2011). "In so doing, we 'need not defer to factual findings rendered by the district court.'" *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018) (quoting *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006)).

### B.    ADEA Claims and the McDonnell Douglas Framework

Under the ADEA, "[i]t shall be unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a). This prohibition on discrimination applies to protect "individuals who are at least 40 years of age." 29

U.S.C. § 631(a). "[A] plaintiff suing under the ADEA must prove that the challenged employment action was motivated, at least in part, by age." *Riggs*, 497 F.3d at 1114 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)). Put in stronger language, "a plaintiff must prove that age was [a] 'but-for cause of the employer's adverse decision.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).[7]

A plaintiff "may carry this burden either by presenting direct evidence of the employer's discriminatory intent or by presenting circumstantial evidence creating an inference of a discriminatory motive using the tripartite *McDonnell Douglas* burden-shifting analysis." *Riggs*, 497 F.3d at 1114. Mr. Markley concedes he has no direct

---

[7] Mr. Markley contends the "but-for" causation requirement from *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009), applies at the trial stage but does not apply at the summary judgment stage. *Gross* was an appeal following a jury verdict. *Id.* at 171. However, *Frappied v. Affinity Gaming Black Hawk, LLC* was an appeal from a district court's grant of summary judgment. 966 F.3d 1038, 1056 (10th Cir. 2020). And Mr. Markley has not identified any decision from this circuit prior to *Frappied* that limited the "but-for" causation requirement to the trial stage. Rather, cases in the years immediately following *Gross* applied the "but-for" causation requirement at the summary judgment stage. *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 945, 947 (10th Cir. 2011); *see also Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1188, 1193 (10th Cir. 2010) (concluding, in context of appeal from grant of summary judgment, that it is "the employee's burden to show that age was the 'but for' cause of the action"). Thus, to overcome a motion for summary judgment under our precedent, an ADEA plaintiff must produce evidence capable of supporting the conclusion that but-for the plaintiff's age, the contested employment action would not have occurred. This, however, should not be confused with the concept that age alone motivated the challenged employment action, for an ADEA plaintiff may prevail if "age was *a factor* that made a difference." *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1277 (10th Cir. 2010) (emphasis added) (quotation marks omitted).

evidence that age discrimination played any role in his termination. *See* Appellant's Br. at 9 ("Markley does not possess direct evidence of age discrimination."). Thus, Mr. Markley must proceed under the *McDonnell Douglas* framework, as modified for an ADEA claim.

At the first step of the burden-shifting framework, the plaintiff must establish a prima facie case of discrimination. *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004). "[T]o establish a prima facie case of age discrimination, the plaintiff must show that (1) he is within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) his position was filled by a younger person." *Id.* (internal quotation marks omitted). "These elements of a prima facie case under the *McDonnell Douglas* framework are neither rigid nor mechanistic, and their purpose is the establishment of an initial inference of unlawful discrimination warranting a presumption of liability in plaintiff's favor." *Frappied*, 966 F.3d at 1056 (internal quotation marks omitted).

If a plaintiff makes out a prima facie case, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Riggs*, 497 F.3d at 1114. "Once the employer identifies a legitimate reason for its action, the burden shifts back to the employee to prove that the proffered legitimate reason was a pretext for discrimination." *Id.* at 1114–15. "A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017). A plaintiff can demonstrate

14

that discrimination was a primary factor "by revealing weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id*. Further, an employer's "failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014). Finally, a plaintiff may be able to demonstrate pretext "with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

"[O]nce a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment." *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1280 (10th Cir. 2010) (quotation marks omitted). Thus, a plaintiff need not "produce 'additional evidence of discrimination' in order to avoid summary judgment." *Id.* (quoting *Reeves*, 530 U.S. at 146). In this sense, the Supreme Court, and in turn this court, has rejected a "pretext-plus" standard at the third prong of the *McDonnell Douglas* framework. *Id.*

15

### C. *Investigatory Deficiencies and Pretext*

As the parties focus on the pretext prong of the *McDonnell Douglas* framework, so too do we.[8] Mr. Markley primarily attempts to establish pretext by pointing to alleged flaws in the investigation conducted by Mr. Plazola. Before addressing the specific contentions raised by Mr. Markley, we discuss the threshold for establishing pretext through reliance on a flawed investigation.

Not every imperfect or errant action by an employer will provide a sufficient basis for an employee to satisfy his burden at the pretext stage. Within the context of an employer failing to follow its written policies, we have stated on numerous occasions that an employer's failure "to follow its own internal procedures does not necessarily suggest that the substantive reasons given by the employer for its employment decision were pretextual." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995)) (ellipses omitted); *see also Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 889 (10th Cir. 2018). Likewise, some flaws in an employer's investigation do not, on their own, necessarily provide a jury sufficient basis to conclude the employer's stated reason for the adverse employment

---

[8] Before the district court, U.S. Bank argued Mr. Markley failed to make out a prima facie case. The district court did not directly rule on this argument; instead, focusing its dismissal on the pretext stage. And, on appeal, U.S. Bank does not renew its arguments about the prima facie stage. Accordingly, although we have serious doubts about whether Mr. Markley made out a prima facie case where the record is devoid of any evidence typical to discrimination claims and where Mr. Markley was replaced by an individual in his protected class, we confine our analysis to the pretext stage argued by the parties on appeal. *But see O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (concluding that ADEA plaintiff can advance claim where replaced by individual in protected category but younger).

16

action was a pretext for discrimination. *See Ainsworth v. Indep. Sch. Dist. No. 3 of Tulsa Cnty.*, 232 F. App'x 765, 774 (10th Cir. 2007) (unpublished) ("[T]he alleged inadequacy of the investigation does not convert the proffered basis for the employment decision into pretext for discrimination."). This is because, flaws in an investigation could be attributable to many factors, including a less than diligent investigator or a nondiscriminatory ulterior motivation an employer may have for terminating an employee. Thus, without some other indicia of pretext, a jury would be left to speculate that the investigatory flaws were attributable to a discriminatory motivation. But a jury cannot render a verdict based on speculation; thus, an employment discrimination plaintiff cannot survive summary judgment where the evidence he produces permits nothing more than a speculative basis for believing discrimination was a motivating factor. *Cf. Peterson v. Shanks*, 149 F.3d 1140, 1144–45 (10th Cir. 1998) (concluding assertions "based on mere speculation rather than evidence" were insufficient to survive summary judgment); *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004) ("Jury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence."). As such, Mr. Markley's criticisms of U.S. Bank's investigation, standing alone, would not create a genuine dispute of material fact as to whether U.S. Bank's proffered justification for discharging Mr. Markley was pretext for discrimination.

With that in mind, we turn to Mr. Markley's arguments regarding the investigation, understanding Mr. Markley to have raised nine challenges to the investigation. First, Mr. Markley contends Mr. Plazola conducted a deficient and

17

predetermined investigation because he never performed any bank research or reviewed sales records and account histories. In support of this argument, Mr. Markley relies upon deposition testimony from Mr. Wahl who, when asked what steps he would take when investigating internal incentive fraud, stated: "A lot of bank research. If there is an ability . . . account histories, transactional histories, potentially surveillance images, whatever would potentially be at our disposal for access to determine if there is any evidence to support or refute the allegations." App. Vol. 6 at 168–69. For two reasons, this somewhat general response does not establish a deficiency in the investigation. Initially, the fraud investigated in this case centered on whether Mr. Markley listed Mr. Provencher as participating in sales in which he was not involved and where he had not met the client. It did not center on whether Mr. Markley mismanaged funds or conducted financial transactions contrary to regulations. Thus, Mr. Plazola made a logical choice by interviewing the members of Mr. Markley's team to determine Mr. Provencher's involvement in certain sales as opposed to reviewing account transactions. Independently, even if Mr. Plazola did not follow U.S. Bank's best procedures when conducting the investigation, "for an inference of pretext to arise on the basis of a procedural irregularity, there must be some evidence that the irregularity *directly and uniquely disadvantaged [the employee]*." *Conroy v. Vilsak*, 707 F.3d 1163, 1176 (10th Cir. 2013) (emphasis added) (internal quotation marks omitted). Yet, although Mr. Markley had the opportunity to develop his case through discovery, he has not identified any bank research, sales records, or account histories demonstrating Mr. Provencher's involvement in the questioned sales. Therefore, Mr. Markley has not produced evidence on this front

18

that would tend to show U.S. Bank's reasons for terminating his employment were false or weak. Accordingly, Mr. Markley's assertion that Mr. Plazola's failure to conduct bank research and to look at records produced a flawed investigatory conclusion is speculative.

Second, Mr. Markley criticizes Mr. Plazola for conducting internet searches on Mr. Markley and Mr. Provencher and for reviewing their social media pages. While these searches might not have been the most fruitful use of Mr. Plazola's time, that fact does not help demonstrate U.S. Bank conducted an insufficient or predetermined investigation. And Mr. Markley concedes these sources of information could have been used to "provide a motive for the alleged misconduct or to identify prior acts that would discredit one or both of the suspects." Appellant's Br. at 13. Thus, Mr. Plazola's investigatory efforts on this front were neither superfluous nor a mere attempt to make it appear that he was conducting a legitimate investigation.

Third, Mr. Markley faults Mr. Plazola for not being familiar with the private wealth consultant compensation plan that governs when an employee may receive sales credit. The structure of the compensation plan and when it permitted the award of sales credit were central to Mr. Markley's defense of the allegations that he improperly listed Mr. Provencher on certain sales. In his deposition testimony, Mr. Plazola could not recall certain aspects of the compensation plan. And Mr. Plazola's investigation report does not make any mention of the compensation plan or any of its terms. Accordingly, this criticism of the investigation raised by Mr. Markley had potential merit. However, like with his first argument regarding the investigation, Mr. Markley failed to provide evidentiary support for his proposition that listing Mr. Provencher on certain sales

complied with the terms of the compensation plan. Specifically, when he presented this argument to the district court, the court concluded "[a]lthough [Mr. Markley] refers to 'documents that could have objectively disproved the allegations of misconduct', he has neither provided nor described such documents." App. Vol. 1 at 178 (quoting Mr. Markley's response to U.S. Bank's motion for summary judgment). And, on appeal, Mr. Markley does not direct us to any provision of the compensation plan that (1) authorized him to list Mr. Provencher on sales where Mr. Provencher had not met the client or (2) otherwise contradicts any conclusion offered by Mr. Plazola in the investigation report. Thus, Mr. Markley has not produced evidence capable of demonstrating that had Mr. Plazola more thoroughly reviewed the compensation plan, he would have reached a different conclusion regarding the propriety of Mr. Markley's actions. This argument, therefore, does not establish any deficiency in the investigation capable of showing pretext.

Fourth, Mr. Markley criticizes Mr. Plazola's review of emails. As part of his investigation, Mr. Plazola obtained emails between Mr. Provencher and the country club to which he belonged that detailed Mr. Provencher's financial straits. Mr. Markley faults Mr. Plazola for reviewing these emails because he believes it "demonstrates [Mr. Plazola] was focused on finding a motive rather than determining if the alleged misconduct actually occurred." Appellant's Br. at 14. But a reasonable investigation includes determining if the accused individual had a motive for committing the offense, especially where, as here, motive was less obvious because Mr. Markley was not receiving any direct, personal benefit from listing Mr. Provencher on sales. Additionally, an

20

individual's motive, or potential lack thereof, may go to the employee's culpability and affect what discipline an employer selects. Accordingly, Mr. Plazola had reason to review Mr. Provencher's emails related to his financial difficulties.[9]

Fifth, Mr. Markley faults Mr. Plazola for not interviewing Mr. Markley's immediate supervisor, Mary Martuscelli. But, as a result of a family emergency, Ms. Martuscelli was not in the office during the month of the investigation. And while she was available remotely, it was not unreasonable for Mr. Plazola to omit contacting her in deference to her more pressing concerns. Furthermore, although Mr. Markley questioned Ms. Martuscelli at a deposition, he does not cite any portion of her testimony as providing responses exculpating his choice to list Mr. Provencher on certain sales. Therefore, Mr. Markley has not demonstrated what information Mr. Plazola failed to gather and include in his case summary as a result of his decision not to interview Ms. Martuscelli.

Sixth, Mr. Markley argues Mr. Ott tainted the investigation by informing Mr. Plazola that he believed the allegations against Mr. Markley, wanted the investigation to move quickly, and wished to terminate Mr. Markley. In support of this argument, Mr. Markley contends Mr. Ott reached these conclusions and expressed his opinion "before US Bank's investigation had truly begun." *Id.* at 16. Mr. Markley pairs

---

[9] Mr. Markley also faults Mr. Plazola for not locating and reviewing "emails regarding the disputed sales." Appellant's Br. at 14. But Mr. Markley does not present any evidence establishing that such emails exist, the content of any such emails, or how any such emails exculpated him. Thus, Mr. Markley, once again, relies on speculation rather than evidence capable of demonstrating a deficiency in the investigation conducted by Mr. Plazola.

this argument with his assertion that age-based bias held by Mr. Ott is attributable to U.S. Bank under a cat's-paw-type theory because Mr. Plazola conducted a shoddy investigation and SMDOC rubber stamped Mr. Ott's recommendation to terminate Mr. Markley's employment.[10]

This argument fails for multiple reasons. One, it is not apparent why Mr. Ott, who was one of Mr. Markley's supervisors, could not share his opinion with Mr. Plazola. Indeed, Mr. Markley fails to cite any case law for the rather unusual proposition that a supervisor should not express an opinion about a subordinate's conduct and the disciplinary consequences therefrom during an investigation into that subordinate. Two, Mr. Markley's argument that it was improper for Mr. Ott to share his views with Mr. Plazola directly conflicts with his argument that Mr. Plazola conducted a deficient investigation by not contacting Ms. Martuscelli. Three, Mr. Ott supported his position with evidence in the form of Mr. Markley's prior loan to Mr. Provencher and the PowerPoint slide where Mr. Markley instructed his team to direct business to Mr. Provencher. Four, it is not apparent from the record that Mr. Plazola blindly accepted

---

[10] In advancing his cat's-paw and rubber-stamp theory, Mr. Markley makes reference to Ms. Hach's and Mr. Wahl's recommendations of termination. However, before the district court, Mr. Markley conceded that he had "no reason to think [Ms.] Hach knew [his] age" and had "no knowledge whether [Mr.] Wahl knew [his] age." App. Vol. 1 at 137–38. Accordingly, without any evidence that Ms. Hach and Mr. Wahl knew his age, Mr. Markley cannot advance an argument that these two individual's recommendations of termination were motivated by age-based discrimination. *Cf. Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (holding that plaintiff advancing retaliation claim "must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire him had knowledge of his protected activity").

Mr. Ott's recommendation of termination. Rather, for two weeks after speaking with Mr. Ott, Mr. Plazola continued to investigate the matter, interviewing multiple employees on Mr. Markley's team and gathering other evidence. Five, and finally, even if Mr. Ott tainted the investigation, Mr. Markley has offered zero evidence that Mr. Ott harbored any age-based bias. Rather, Mr. Ott was roughly Mr. Markley's age and Mr. Markley conceded he had no evidence that Mr. Ott ever made "any age-related comments" or "treat[ed] younger employees more favorably than [Mr. Markley]." App. Vol. 1 at 138. Mr. Markley was also not the only employee on the team within the protected age category. Thus, in the absence of any age-based bias by Mr. Ott, Mr. Markley cannot rely upon the cat's-paw or rubber-stamp theory even if he could demonstrate Mr. Ott tainted the investigation by sharing his views about Mr. Markley's continued employment with Mr. Plazola. *Cf. EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006) ("In the employment discrimination context, 'cat's paw' refers to a situation in which *a biased* subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." (emphasis added)); *see id.* (describing the corollary "rubber stamp" situation as "a situation in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a *biased* subordinate" (emphasis added)).

Seventh, Mr. Markley argues U.S. Bank did not provide him a reasonable opportunity to refute the allegations against him. The record belies this argument; but even if it did not, the argument would not establish pretext. Shortly after Mr. Crittendon raised his concern to Ms. Santanni about Mr. Markley including Mr. Provencher on sales,

23

Ms. Santanni prepared an audit spreadsheet for Mr. Markley to complete. This audit provided Mr. Markley an initial opportunity to respond to the allegations. Further, although Mr. Markley did not know an accusation had been leveled, it is not uncommon or irregular for an employer to attempt to learn an accused employee's position without tipping that employee off to the fact that an accusation has been leveled and an investigation may be underway. Furthermore, it is entirely possible U.S. Bank's investigation would have concluded with a different disposition had Mr. Markley, when responding to the audit report, accurately indicated that Mr. Provencher was not present for some client meetings and explained why Mr. Markley, nonetheless, believed U.S. Bank's compensation plan permitted Mr. Provencher to receive sales credit. Accordingly, under the circumstances, the audit spreadsheet provided Mr. Markley a reasonable opportunity to respond to the allegations.

But even assuming the audit spreadsheet did not provide Mr. Markley a reasonable opportunity to respond, Mr. Plazola's February 26 interview of Mr. Markley did provide a reasonable opportunity. During the February 26 interview, U.S. Bank permitted Mr. Markley an opportunity to defend his audit spreadsheet responses, explain why he believed it was within U.S. Bank policy for him to give Mr. Provencher credit for certain sales, and explain why his PowerPoint slide about running sales through Mr. Provencher was appropriate. Furthermore, Mr. Plazola's interview of Mr. Markley was not the end of the investigation, as Mr. Plazola conducted four of the nine interviews of Mr. Markley's team members *after* he interviewed Mr. Markley. Thus, contrary to Mr. Markley's

24

argument, Mr. Plazola did not interview him as a last-minute procedural formality immediately before U.S. Bank terminated Mr. Markley.

Even if a jury could conclude U.S. Bank did not provide Mr. Markley a reasonable opportunity to respond, however, such would not permit an inference of pretext. It is true that we have relied, at least in part, on whether an employer gave an employee an opportunity to tell his side of the story when rejecting an employee's pretext and cat's paw arguments. *See Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 516–17 (10th Cir. 2015) (relying on termination review panel's review of employee's entire disciplinary record for eight supervisors and interview of employee when rejecting cat's paw theory). However, we have never said an employer, to avoid an inference of pretext, must give an employee an opportunity to explain his version of events. To this point, we have rejected the assertion of pretext and subordinate bias in a situation where the employer did not permit the employee any opportunity to provide his version of events. *See Cox v. Lockheed Martin Corp.*, 545 F. App'x 766, 772–73 (10th Cir. 2013) (unpublished); *cf. Parker v. United Airlines, Inc.*, 49 F.4th 1331, 1339 (10th Cir. 2022) (focusing the cat's paw analysis on the overall "independence of the employer's investigation"). In this case, there are no indications in the record that any U.S. Bank employee involved in Mr. Markley's termination harbored any age-based bias, and Mr. Markley was not the only U.S. Bank employee falling within the age-protected category. Accordingly, had U.S. Bank never interviewed Mr. Markley before terminating his employment, such would not permit the inference of pretext because a jury would have been left to speculate whether such an omission was attributable to age-based discrimination.

25

Eighth, Mr. Markley contends Mr. Plazola misrepresented his audit spreadsheet responses in the case summary provided to SMDOC. The audit spreadsheet asked Mr. Markley, for each client, if Mr. Provencher was "present at client meetings (Y/N)." App. Vol. 4 at 42. The audit spreadsheet also included a "Notes" column where Mr. Markley could explain or expand on any of his answers. *Id.* Mr. Markley answered "Y" as to every client and none of Mr. Markley's comments in the "Notes" column qualified these affirmative responses. *See id.* at 42–43. In his case summary, Mr. Plazola wrote, "The business line conducted a subsequent audit of [Mr.] Provencher's sales and requested [Mr.] Markley's justification for credited sales occurring between 01/2017 and 11/2017. [Mr.] Markley reported that [Mr.] Provencher was present at all client meetings for these sales." App. Vol. 5 at 279. Mr. Plazola then stated, "[d]uring investigative interviews, six Private Wealth Management employees identified eight sales in which [Mr.] Provencher had no involvement, but was awarded sales credit." *Id.*

Mr. Plazola's case summary is accurate in that it highlighted a discrepancy between Mr. Markley's audit spreadsheet responses and the statements provided by members of Mr. Markley's team. In providing unqualified "Y" responses as to Mr. Provencher's involvement in client meetings, Mr. Markley signaled that Mr. Provencher met each client and contributed to the investment or sale relative to each client. However, several members of Mr. Markley's team informed Mr. Plazola that Mr. Provencher never met some of the clients and was not involved in sales as to others. Mr. Provencher admitted he had not met some of the clients for which he received sales credit. And, in Mr. Plazola's words, even Mr. Markley conceded that, in his mind, "it was

26

ok for [Mr. Provencher] to receive commission on a sale [he] was not involved in due to the anticipation of future sales [he] was going to bring in with the client." App. Vol. 4 at 61. Thus, Mr. Plazola accurately conveyed the problem with Mr. Markley's audit responses—Mr. Markley identified Mr. Provencher as participating in some client meetings related to client sales despite Mr. Provencher's lack of involvement in the sales.

Ninth, and finally, Mr. Markley faults Mr. Plazola for not including statements from an administrative staff member of Mr. Markley's team who was responsible for entering the names of team members receiving sales credit. The administrative staff member told Mr. Plazola that Mr. Provencher was "assigned . . . by default sometimes" to a sale and that she "would review and confirm with the [private wealth accountant] if sales team is accurate." *Id.* at 50. This statement arguably may have been beneficial to Mr. Markley's position as it suggests the administrative staff member may have confirmed the inclusion of Mr. Provencher on some sales with some of the individuals who provided statements against Mr. Markley. However, the statement is of limited value because it pertains only to situations where Mr. Provencher had been assigned to a sale "by default" and not to situations where Mr. Markley assigned Mr. Provencher to a sale. Accordingly, when summarizing evidence, it is not surprising that Mr. Plazola would omit this statement given its potential limited breadth. And Mr. Markley does not provide any evidence that Mr. Provencher was assigned to any of the sales in question by default or that, specific to the sales in question, the administrative staff member checked with any member of Mr. Markley's team to confirm Mr. Provencher's involvement. Further, Mr. Plazola's case summary to the SMDOC was just that, a summary. It did not include

27

specific statements from any individuals other than Mr. Markley and Mr. Provencher. So, while the report may have omitted a statement potentially favorable to Mr. Markley, it also omitted numerous statements inculpating Mr. Markley. On the whole, Mr. Markley's argument about a single statement from an administrative staff member fails to support a finding of pretext.

In summation, while Mr. Markley identifies some additional investigatory steps Mr. Plazola could have taken, Mr. Markley does not provide any evidentiary basis to believe these additional steps would have produced valuable evidence supporting the conclusion that he had not improperly included Mr. Provencher on certain sales. Additionally, most of Mr. Markley's arguments about the investigation are without merit and others had no demonstrable impact on the result. Accordingly, we conclude any imperfections in the investigation are not capable of allowing a reasonable jury to conclude U.S. Bank's reasons for terminating Mr. Markley were a pretext for age discrimination.

### D.    *Other Arguments on Pretext*

In addition to his criticisms of the investigation, Mr. Markley advances two other arguments in support of his position that he produced evidence capable of demonstrating that U.S. Bank's termination of his employment was a pretext for age discrimination. First, Mr. Markley argues his attempts to switch Mr. Provencher to an all salary, no commission compensation plan brings into question U.S. Bank's conclusion that he was trying to funnel commissions to Mr. Provencher. Mr. Markley is correct that he sought to move Mr. Provencher to a salary-only compensation plan. However, the record evidence

28

shows Mr. Markley did not embark on this effort until early February 2018, which was *after* the alleged wrongdoing, *after* Mr. Crittendon raised his concerns, and *after* the investigation started. Thus, this effort by Mr. Markley does not contradict other record evidence that, in 2017, he improperly listed Mr. Provencher for sales credit. Nor does it reveal Mr. Markley's intent behind the compensation plan switch. Mr. Markley does not identify any record evidence discussing Mr. Provencher's possible salary, such that it is entirely possible Mr. Markley believed Mr. Provencher would make more money as a salaried employee than he was earning on the commission system. For these reasons, a reasonable jury would be unable to draw any non-speculative inference from Mr. Markley's February-2018 attempt to change Mr. Provencher's compensation structure. Therefore, the argument does nothing to establish that U.S. Bank's reason for terminating Mr. Markley was weak or pretextual.

Second, Mr. Markley argues U.S. Bank failed to follow its written policy when it did not investigate his claim that Mr. Crittendon and others raised allegations against him in retaliation for him stopping a sandbagging effort in December 2017. As stated earlier, a plaintiff can demonstrate pretext "with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Kendrick*, 220 F.3d at 1230. But "[t]he mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual." *Randle*, 69 F.3d at 454. And "for an inference of pretext to arise on the basis of a procedural irregularity, there must be

29

some evidence that the irregularity *directly and uniquely disadvantaged [the employee].*"
*Conroy*, 707 F.3d at 1176 (emphasis added) (quotation marks, brackets, and ellipses omitted).

It is not apparent that U.S. Bank technically acted contrary to its written policies but, if it did, any procedural irregularity did not directly disadvantage Mr. Markley. Through a written policy, U.S. Bank promises its employees that "allegations of sales misconduct or retaliation on the basis of reporting sales misconduct will be thoroughly investigated in accordance with established procedures, irrespective of how received by the Bank, or whether they are deemed 'formal' or 'informal.'" App. Vol. 6 at 206. Listed as a type of sales misconduct is "*Waiting* to open customer requested accounts due to sales campaigns or to push it to the following reporting period." *Id.* at 207. Accordingly, had Mr. Crittendon succeeded in his sandbagging effort and Mr. Markley reported it, the policy would have commanded that U.S. Bank investigate Mr. Markley's allegation. Mr. Markley's allegation, however, is a bit different. Mr. Markley, having prevented Mr. Crittendon from sandbagging, did not report the occurrence of any sales misconduct. And where Mr. Markley never reported any sales misconduct, his allegation, likewise, did not qualify as an allegation of "retaliation on the basis of reporting sales misconduct." *Id.* at 206. Thus, although Mr. Crittendon may have had a motive to retaliate against Mr. Markley, the nature of the retaliatory motive did not fall squarely within U.S. Bank's policy regarding initiation of an investigation.

To the extent, however, that a reasonable jury might not adopt this technical approach for why U.S. Bank policy did not compel an investigation into Mr. Markley's

30

claim of retaliation, there are other reasons for rejecting his argument. Although U.S. Bank did not investigate the retaliation aspect of Mr. Markley's allegation, it looked into whether there was any delay in investing the client's funds. Ultimately, U.S. Bank did not open a formal investigation "because the funds were not delayed. . . . the business line confirmed that the funds were processed as they should be." App. Vol. 7 at 105. Thus, U.S. Bank did investigate the matter to a degree so as to protect its business interests and to ensure the client funds had been properly invested. Moreover, it is not apparent that Mr. Markley was "directly and uniquely disadvantaged," *Conroy*, 707 F.3d at 1176, by U.S. Bank's failure to conduct a formal investigation. Certainly, an investigation might have supported Mr. Markley's contention that *some* members of his team attempted to engage in sandbagging and had motive to raise a false allegation against him. However, Mr. Markley's allegations regarding sandbagging did not extend to individuals such as Mr. Romero and Mr. Sawyer, who also implicated Mr. Markley as improperly listing Mr. Provencher on sales. And, as already discussed, Mr. Provencher admitted he received sales credit for some client sales with which he was not involved. Accordingly, even without the statements of Mr. Crittendon, Ms. Boskovich and Ms. Kane, U.S. Bank had more than ample evidence to conclude Mr. Markley had improperly listed Mr. Provencher on certain sales. Finally, the record is devoid of any evidence tying an alleged deficiency in the investigation to Mr. Markley's age.

### III.    CONCLUSION

We AFFIRM the district court's grant of summary judgment. In the complete absence of other evidence of impermissible bias, imperfections in an investigation

31

supporting an adverse employment action are insufficient to establish pretext and

Mr. Markley has also generally failed to produce evidence demonstrating Mr. Plazola's

investigation suffered from significant deficiencies.